**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ralph G. FAGAN, Defendant-Appellant.**

**No. 86–2284.**

United States Court of Appeals,
Fifth Circuit.

June 30, 1987.

Rehearing Denied Aug. 10, 1987.

---

**24.** *See Castaldo v. United States Parole Comm'n,* 725 F.2d 94, 96 (10th Cir.1984); *Solomon v.* *Elsea,* 676 F.2d 282, 287 (7th Cir.1982).

**1004**

Richard V. Burnes, Alexandria, La., for defendant-appellant.

James R. Gough, Asst. U.S. Atty., Houston, Tex., Henry K. Oncken, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before RANDALL, GARWOOD, and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Ralph Fagan was convicted of aiding and abetting on nine counts of mail fraud, 18 U.S.C. § 1341, one count of witness intimidation, 18 U.S.C. § 1512(a), and one count of transmitting a threat in interstate commerce, 18 U.S.C. § 875(b). The district court imposed concurrent two-year sentences on each count. We affirm.

### Facts and Proceedings Below

#### A. The Mail Fraud

Ralph Fagan owned two Louisiana corporations—Toddell Enterprises, Inc. and Fagan Boat Service, Inc.—engaged in leasing work boats (used to transport heavy equipment to offshore drilling platforms) and crew boats (smaller boats used for ferrying crews and supplies) to offshore drilling companies. Sometime late in 1980 or early in 1981, Fagan was introduced to Donald L. Riley, who at that time was drilling superintendent of Texoma Production Company, a wholly-owned subsidiary of Mid-Continent Petroleum. As drilling superintendent Riley made the initial choice of the companies from which to lease boats for a given drilling project. The drilling superintendent sent his selection for approval to the manager of drilling; from there the recommendation went to Texoma's vice president for drilling and production, and finally the recommendation was sent to Texoma's president.

Apparently, Riley leased some boats from Fagan's companies shortly after their first meeting. Soon thereafter, Riley was promoted to manager of drilling. He hired Jeffrey Reid Hughes to fill his former job as drilling superintendent.

Sometime in the first half of 1981, Fagan and Riley—who was by then the manager of drilling—agreed to a kickback scheme. Fagan would pay Riley $100 a day for each boat that Texoma leased from Fagan's companies. Beginning in August 1981 and continuing until May 1983, Fagan or his companies paid Riley about $165,000 in twelve checks made payable to C & D Consultants, Inc., a corporation created by Riley at least partially to hide the kickbacks from Texoma. All the checks were mailed from Larose, Louisiana, a town not too far from New Orleans, in the Eastern District of Louisiana, to Spring, Texas, a town near Houston, in the Southern District of Texas.

When the scheme had been in place just a short time, Riley told Hughes about it and urged him to set up a dummy company so he could receive part of the kickbacks Fagan was paying to Riley. Hughes agreed, and Riley split his kickbacks with Hughes on four occasions, but stopped doing so without explanation, even though Riley continued receiving kickbacks from Fagan.

Each of the twelve checks was the basis of a separate count charging Fagan, Hughes, and Riley with mail fraud. At trial the government dropped three of the counts (counts 5, 7, and 9) because on three occasions two checks were mailed together. Thus there were only nine mailings. *See United States v. Blankenship*, 746 F.2d 233, 236 (5th Cir.1984) (each separate use of the mails is a separate crime). In exchange for Riley's testimony and cooperation at trial and his plea of guilty to four counts, the government dropped the remaining counts against him and also promised not to seek charges against Riley arising from other illegal activities in which he was involved, including at least one other kickback arrangement. Fagan was convicted on all nine mail fraud counts. The jury acquitted Hughes.

#### B. The Threats

Sometime after the last kickback was sent, Texoma fired Riley. He had violated company policy by leasing a computer for Texoma from his son's company. At this point, Texoma's parent, Mid-Continent, still did not know about the kickback scheme, but for several months Mid-Continent auditors had been suspicious of the informality of the relationship between Fagan's companies and Texoma. Large sums of money were being paid by Texoma to lease Fagan's boats, yet there was little documentation that Texoma had solicited bids from other companies. Mid-Continent eventually discovered the kickback scheme and caused Texoma to file a civil action against Fagan and others. At all times material, the suit was pending in the United States District Court for the Southern District of Texas, Houston Division. In connection with this civil suit, the final important character in this appeal, Thomas Woolsey, comes on the scene.

Woolsey was a friend of Fagan's, to whom he had been introduced by Riley. At the time, Riley and Woolsey were also friends, but they later had a falling out over Riley's decision to lease a computer for Texoma from his son's company rather than from Woolsey.

In the fall of 1984 Fagan repeatedly expressed concern to Woolsey about what Riley's testimony might be in Texoma's civil suit against Fagan and others. According to Woolsey, Fagan said he could not afford to have Riley testify against him and that a no-show by Riley would be worth $20,000. Woolsey testified that he understood this to be an offer by Fagan to pay him or anyone else to obtain Riley's silence by any means, including murder.

On December 26, 1984, Woolsey, slightly inebriated, went to Riley's home near Houston. Woolsey testified he intended to beat Riley up if he would not agree not to testify about the kickback scheme. Riley was not home, but Woolsey stayed for some time, frightening Riley's wife and daughter with his behavior and threats of violence to Riley. While there Woolsey also spoke to Riley on the telephone, threatening and attempting to bribe Riley not to testify in the suit. Nothing was resolved except that the two agreed to discuss the matter later. After talking to Riley, Woolsey, the same day, called Fagan from the Riley house and later from a pay phone. Woolsey testified that both times he told Fagan that he thought that bribery, as opposed to other means, would suffice to cause Riley not to testify.

Woolsey's December 26 threats frightened Riley, and he sought protection for himself and his family from the FBI. The FBI instructed him to record his subsequent telephone conversations with Woolsey, and Riley complied. On December 28 and again on December 30, Woolsey, then in the Southern District of Texas, called Riley, then in the Western District of Louisiana. The transcripts of Riley's recordings of those conversations were introduced as evidence.

Although in neither of the latter two conversations does Woolsey explicitly threaten to kill Riley, in both conversations the threat of violence is clearly implicit, particularly in light of the events of December 26. The conclusion of the December 30 conversation was that Riley would accept $50,000 not to testify.

Immediately after his December 30 conversation with Riley, Woolsey called Fagan, who told him to have no further contact with Riley because Fagan suspected that Riley was cooperating with the government. Fagan was arrested a few weeks later. He was indicted in December 1985 and tried in February 1986. The jury found him guilty of the nine counts of mail fraud (counts 1, 2, 3, 4, 6, 8, 10, 11, and 12; 18 U.S.C. §§ 1341, 2). It also found him guilty of inducing and procuring (18 U.S.C. § 2) Woolsey to transmit a threat in interstate commerce (count 14; 18 U.S.C. § 875(b)) and to intimidate a witness (count 13; 18 U.S.C. § 1512(a)), each in respect to Woolsey's December 30 telephone call to Riley. The district court convicted Fagan on all eleven counts and sentenced him thereon to eleven concurrent two-year prison terms and imposed a $50 special assessment on both threat-related counts.

## Discussion

On this appeal, Fagan raises several challenges to his convictions.

### I. Refusal to Sever

Fagan's first contention is that the district court erred in refusing to sever the mail fraud counts from the interstate threat and witness intimidation counts. The relevant rules of procedure governing this issue are Fed.R.Crim.P. 8(a) and 14.

### A. Rule 8(a)

■ Rule 8(a) allows the joinder of offenses against a single defendant "if the offenses ... [1] are of the same or similar character or [2] are based on the same act or transaction or [3] on two or more acts or transactions connected together or constituting parts of a common scheme or plan." We review *de novo* the district court's denial of a Rule 8(a) motion. *United States v. Davis*, 752 F.2d 963, 971 (5th Cir.1985);

United States v. Forrest, 623 F.2d 1107, 1114 (5th Cir.); cert. denied, 449 U.S. 924, 101 S.Ct. 327, 66 L.Ed.2d 153 (1980); cf. United States v. Lane, 474 U.S. 438, 106 S.Ct. 725, 732 n. 12, 88 L.Ed.2d 814 (1986) (joinder of defendants under Rule 8(b) is reviewed on appeal for an "error of law").

■ In rejecting Fagan's motion to sever, the district court did not violate Rule 8(a). Joinder was clearly appropriate under the third clause of Rule 8: "two or more acts ... connected together or constituting parts of a common scheme or plan." Fagan argues that the mail fraud counts involve a different scheme than the witness intimidation counts. We disagree. The threat and intimidation were related to the fraudulent scheme. From Fagan's point of view, the scheme could not be considered a success if it or his part in it were to be established on the public record or if he were to be held civilly liable for it. Fagan's participation in intimidating Riley was an integral part of his continuing effort to ensure nondisclosure and retain the benefits of his fraud.

On similar facts we reached the same conclusion in United States v. Davis, 752 F.2d 963 (5th Cir.1985). The defendant was indicted for mail fraud and for making false statements to a federally insured bank. He was also charged with obstructing justice because, inter alia, he directed a witness in the mail fraud case to testify a certain way. Like Fagan, the Davis defendant argued that "the two obstruction of justice charges and the mail fraud and false statement charges grew out of a separate set of circumstances." 752 F.2d at 972. We held to the contrary. "Both obstruction charges grew out of Davis' attempt to avoid implication in or the detection of a fraudulent scheme. Thus, the coverup attempts bear a logical relationship to the underlying fraud crimes." Id.; see also United States v. Scott, 659 F.2d 585, 589 (5th Cir.1981), cert. denied, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 105 (1982); United States v. Duzac, 622 F.2d 911 (5th Cir.), cert. denied, 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980).

**B. Rule 14**

■ Fagan also argues that joinder of the claims prejudiced him because he wanted to testify on his behalf with regard to the threat-related counts, but not the mail fraud counts. This argument is cognizable under Rule 14, which allows the district court to sever offenses properly joined under Rule 8 upon a showing of prejudice. We review the disposition of Rule 14 motions for an abuse of discretion. E.g., Lane, 106 S.Ct. at 732 n. 12; Davis, 752 F.2d at 974.

■ The district court did not abuse its discretion in denying Fagan's Rule 14 motion. Fagan did not inform the district court until after the jury's verdict that he wanted the counts severed so that he could testify with regard to some but not others. This is simply too late. There is no valid reason Fagan could not have properly brought this contention to the district court's attention before trial began. Fagan's tardy post-verdict assertion did not meet his burden of demonstrating that he had "important testimony to give concerning one count and a strong need to refrain from testifying on the other." Forrest, 623 F.2d at 1115 (quoting Alvarez v. Wainwright, 607 F.2d 683, 686 (5th Cir.1979)). Until the trial was over, the only reason Fagan gave for a Rule 14 severance was that the jury would think worse of him if all counts were tried together and therefore would be more prone to convict him. As we pointed out in Forrest, this possibility exists anytime a defendant is tried on more than one count; standing alone it is not grounds for a new trial. 623 F.2d at 1115. Fagan was not otherwise prejudiced by the joinder of all counts because evidence of the mail fraud scheme would have been admissible in a separate trial for witness tampering to show Fagan's motive. Evidence of the witness tampering would have been admissible in a separate mail fraud trial to show Fagan's guilty knowledge. See Davis, 752 F.2d at 972; Scott, 659 F.2d at 589.

**II. Refusal to Transfer the Case**

■ In the district court, Fagan filed an unsuccessful Fed.R.Crim.P. 21(b) motion

(permitting transfer for convenience and in the interest of justice), to transfer all counts against him from the Southern District of Texas, Houston Division, to the Eastern District of Louisiana, where he lived. On appeal Fagan asserts that the district court committed reversible error in denying the motion. To prevail, Fagan must show that in denying the transfer the trial judge abused his "broad discretion." *United States v. Dickie*, 775 F.2d 607, 609 (5th Cir.1985). *See also United States v. Juarez*, 573 F.2d 267, 280 (5th Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978). After surveying the Rule 21 appellate cases, Professor Wright reports, "In no case has a final judgment been reversed on this ground." 2 C. Wright, *Federal Practice & Procedure (Criminal)* § 347, at 282 (1982 and Supp. 1986).

■ Fagan asserts that holding trial in Houston, rather than Louisiana, made it more disruptive to him, his witnesses, and his attorney. He also asserts that if he had been tried in Louisiana, one particular attorney, who did not represent him in this trial, would have participated in his defense. However, the inconvenience Fagan asserts does not show the prejudice necessary to establish abuse of discretion. In *United States v. Alvarado*, 647 F.2d 537 (5th Cir.1981), a case involving the transfer of a case from Brownsville to Victoria, this Court held that the "additional travel and lodging expenses upon [defendants] and their attorneys in addition to the expenses that became necessary in order to subpoena crucial witnesses" did not demonstrate sufficient prejudice to establish an abuse of discretion. 647 F.2d at 539. The distance in this case is somewhat greater, but Fagan has not shown that the fact he was tried in Houston kept him from calling any witness, prevented his access to any evidence, or in any other way prejudiced the outcome of his case. Fagan does not dis-

pute that venue was proper in the Southern District of Texas. He had mailed the kickback checks to a town in that district and it was from that district that Woolsey had made the threatening phone call. *See* Fed. R.Crim.P. 18; 18 U.S.C. § 3237(a). Further, the threats related to the civil suit against Fagan for his part in the kickback scheme and that suit was pending in Houston. Moreover, as Riley was in the Western District of Louisiana when the threatening call was made to him, and as the charged mailings were all made from the Eastern District of Louisiana, the Southern District of Texas was the *only* district in which (at least absent further evidence) venue was initially proper as to all counts. While this does not prevent a Rule 21(b) transfer of all counts to another district, it is at least an indication that the government's selection of the forum was not arbitrary.

We conclude that the district court did not abuse its discretion in denying Fagan's Rule 21(b) motion.

### III. "Scheme to Defraud"

■ "To establish a mail fraud violation, the government must prove [1] the existence of a scheme to defraud that [2] involved use of the mails for the purpose of executing the scheme. The evidence must demonstrate [3] the defendant's specific intent to commit fraud." *United States v. Goss*, 650 F.2d 1336, 1341 (5th Cir.1981) (citations omitted). Viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Blankenship*, 746 F.2d 233, 241 (5th Cir. 1984), the evidence is sufficient to sustain Fagan's mail fraud convictions.

■ As for the "scheme to defraud," unrebutted testimony from several witnesses, including Riley, established the existence of the kickback scheme.[1] Fagan as-

1. In the course of establishing the existence of the kickback scheme, the government called Chris Boudreau, a Lafourche Parish deputy sheriff, to testify regarding his investigation of a criminal extortion complaint that Fagan had filed in Louisiana state court against Riley, ap-

parently not long after the scheme ended. As part of his investigation, Boudreau taped an interview in which Fagan described his arrangement with Riley. (With regard to this state charge, Riley pleaded guilty to a reduced charge of commercial bribery and was fined.)

serts, however, that the evidence is insufficient to show that this scheme was one to defraud. He claims in this connection that Texoma was not defrauded within the meaning of section 1341 because he absorbed the costs of the kickbacks himself, and his leasing rates remained competitive.[2]

■ We reject this contention. We have stated that section 1341 is violated when an employee violates his duty to disclose to his employer economically material information which the "employee has reason to believe ... would lead a reasonable employer to change its business conduct." *United States v. Ballard*, 663 F.2d 534, 541 (5th Cir.1981) (*Ballard I*), *as modified on reh'g*, 680 F.2d 352 (5th Cir.1982) (*Ballard II*).[3]

We held in *Ballard I* that the intricate kickback scheme in that case was not a "scheme to defraud" because the "defrauded" employers, whose prices were strictly regulated by federal law, could not have charged any higher price, even had they known that their employees were accepting kickbacks to sell to certain customers. There was, therefore, no potential economic detriment to the employers—and *Ballard I* expressly held that in the absence of some detriment, a breach of fiduciary duty does not constitute a mail fraud violation. *Ballard I*, 663 F.2d at 540. However, *Ballard II* observed, "[I]n an unregulated market, the detriment necessary for a finding of mail fraud ... would be shown by mere receipt of kickbacks." 680 F.2d at 354 n. 5.

This case, involving the unregulated boat leasing market, falls within the dictum of *Ballard II*. The kickback scheme deprived Texoma of economically material information regarding the amount Fagan would have accepted for his boats. Quite simply, if Riley had not violated his duty to disclose, Texoma might have captured for itself the large sums that Riley was secreting because Texoma would have known that Fagan was willing to lease his boats for less. This possibility clearly had some economic value.

A leading case in support of this conclusion is *United States v. George*, 477 F.2d 508 (7th Cir.), *cert. denied*, 414 U.S. 827, 94 S.Ct. 49, 155, 158, 38 L.Ed.2d 61 (1973). In *George*, a cabinet buyer for Zenith Radio

At Fagan's trial, the district court allowed Boudreau to describe this conversation over the objections of Fagan's counsel, who asserted that the testimony violated the "best evidence" rule—Fed.R.Evid. 1002—because the tape of the conversation was available. On appeal, Fagan again asserts that the district court violated the "best evidence" rule. This argument is completely without merit.

The Advisory Committee notes following Rule 1002 state, "Application of the rule requires a resolution of the question whether contents are sought to be proved. Thus an event may be proved by nondocumentary evidence, even though a written record of it was made." The prosecution was not trying to show the contents of the *tape*, but rather the contents of the *conversation*, and, therefore, as the Advisory Committee note suggests, the best evidence rule is inapplicable. *See United States v. Rusmisel*, 716 F.2d 301, 314 n. 16 (5th Cir.1983); *R & R Associates, Inc. v. Visual Scene, Inc.*, 726 F.2d 36, 38 (1st Cir.1984) ("Rule 1002 applies not when a piece of evidence sought to be introduced has been somewhere recorded in writing but when it is that written record itself that the party seeks to prove."); E. Cleary, *McCormick on Evidence* § 233, at 708 (3d ed. 1984) (stating that "many facts may be proved without resort to writings which record them"). The recording

was, of course, available to Fagan, and he was not prevented from utilizing it.

2. Fagan never made a motion for judgment of acquittal (nor did any of his post-trial motions raise any question as to the sufficiency of the evidence respecting any of the mail fraud counts). Accordingly, the sufficiency of the evidence on those counts is reviewed solely for manifest miscarriage of justice. *United States v. Freeze*, 707 F.2d 132, 135 (5th Cir.1983).

We also note that no complaints of the charge are asserted on this appeal. Indeed, the charge is not included in the record (the government advises that the charge has not been transcribed because appellant did not so request in ordering the record on appeal, and appellant has not disputed this or requested supplementation of the record).

3. As manager of drilling, Riley was based in Texoma's Houston office, and he lived in Texas. We note that under Texas law Riley owed Texoma an obligation "to do no act which ha[d] a tendency to injure the employer's business or financial interest." *Advance Ross Electronics Corp. v. Green*, 624 S.W.2d 316, 318 (Tex.App.1981—Tyler, writ ref'd n.r.e.), *cert. denied*, 458 U.S. 1108, 102 S.Ct. 3488, 73 L.Ed.2d 1370 (1982); *see Turner v. Byers*, 562 S.W.2d 507, 510 (Tex.Civ.App.1978—El Paso, writ ref'd n.r.e.).

**1010**

Corporation received kickbacks from a supplier of cabinets. The defendants—the buyer, supplier, and a third party who assisted in the scheme—argued that Zenith was not defrauded because the supplier's prices were reasonable, the quality was good, and the supplier apparently absorbed the kickbacks without passing them on to Zenith. *Id.* at 512. The Seventh Circuit rejected this reasoning. "Not only did [the Zenith employee] secretly earn a profit from his agency, but also he deprived Zenith of material knowledge that [the supplier] would accept less profit." *Id.* at 513. Fagan was willing to lease his boats to Texoma at a lesser rental—the amount of the actual rental less the kickbacks. Riley plainly breached his duty to Texoma by secretly receiving and retaining the kickbacks. *See* note 3, *supra.* In these circumstances, Texoma was entitled to those funds. *See* 53 Am.Jur.2d *Master & Servant* § 101 at 173.[4] *See also United States v. Drumm,* 329 F.2d 109 (1st Cir.1964). The scheme was calculated to deprive Texoma of this economic benefit.[5] Moreover, as *George* observed, " 'A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value.' " 477 F.2d at 513 (quoting *United States v. Rowe,* 56 F.2d 747, 749 (2d Cir.), *cert. denied,* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932)). Here, Texoma was fraudulently induced to part with its rental payments on the false premise (implicitly represented to it by Riley's nondisclosure when he had a fiduciary duty to disclose) that Riley, its employee making the rental decisions, was not receiving a portion of the rental payments from the lessor, Fagan, and that the latter was not accepting less than the stated rent.

Other out-of-circuit decisions in cases no stronger from the prosecution's point of view than the present also support the government's position here. Without necessarily endorsing all the language in each of the cited opinions, we call attention to them because they dispel the notion that this kickback scheme contemplated no sufficient detriment to Texoma. *See, e.g., United States v. Connor,* 752 F.2d 566, 573 (11th Cir.) (employee defrauded his employer by accepting kickback in connection with employer's land purchase even if the purchase price was "within the range of prices encompassed within the fair market value of the land" because without the employee's disloyalty the employer might have obtained a better deal), *cert. denied,* —— U.S. ——, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985); *United States v. Bush,* 522 F.2d 641, 648 (7th Cir.1975) (city official who used his position to influence Chicago's award of advertising contract at O'Hare Airport violated section 1341 by failing to disclose his ownership interest in the successful bidder, even though contract was profitable to the city because, *inter alia,* "if the city had known of [defendant's] interest it might have been able to obtain a better contract"), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *United States v. Barrett,* 505 F.2d 1091, 1103–05 (7th Cir.1974), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975). These decisions dispel the notion that the instant kickback scheme contemplated no sufficient economic detriment to Texoma.[6]

---

**4.** "The employee or agent may be required to account for any secret profit, gift, gratuity, or benefit which he may have received in the course of the performance of his service. An employee is bound to the exercise of good faith toward his employer and cannot, without the latter's consent, retain profits or earnings received in the course of performance of the employer's business, or in an undertaking which constitutes a breach of duty to the employer or which conflicts with his duties to his employer." *Id.* (footnotes omitted).

**5.** As observed in *George,* this is unlike certain other more attenuated and indirect conflict of interest situations. 477 F.2d at 512 n. 5. It is also unlike the situation where the public policy of a price control or similar statute may have precluded any possible such benefit to the employer, as in *Ballard.*

**6.** This opinion was prepared prior to the Supreme Court's June 24, 1987 decision in *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *McNally* involved an insurance broker serving the State of Kentucky who secretly funneled portions of the commissions, which the underwriters paid the broker, to state employees who saw to it that the broker continued to serve the state. However, we

In addition to our conclusion that the evidence amply established the existence of a "scheme to defraud," we hold that the evidence shows the requisite intent. The kickback scheme was not a creature of accident; Riley and Fagan carefully conceived and orchestrated it. The steps taken to hide the scheme show that the pair knew they were doing wrong. Contrary to Fagan's intimations on appeal, their asserted agreement that Fagan's leasing rates would remain competitive does not negate the intent to defraud. Even if Fagan and Riley were sincere, each knew that Fagan was willing to lease to Texoma for the lesser sums and that Texoma could have been receiving the benefit of Fagan's kickbacks to its employee Riley. But this was all knowingly hidden from Texoma, and in this breach of duty Fagan was Riley's equal partner. *See George*, 477 F.2d at 513–14 (intent to defraud found in receipt of kickbacks).

Finally, as for the "use of the mails" element, unrebutted testimony established use of the mails to transfer the kickback checks from Fagan to Riley, and Fagan does not claim an insufficiency of evidence on this element.

### IV. The Interstate Threat and Witness Intimidation Charges

Counts 13 and 14 of the indictment charged Fagan, under 18 U.S.C. § 2, with inducing and procuring Woolsey's threats to Riley in the December 30, 1984, telephone call, contrary to 18 U.S.C. §§ 1512(a) and 875(b). Fagan's sole complaint on appeal as to these counts is that "[t]he evidence does not support a finding that defendant, Fagan, was accountable for the conduct of government witness Thomas Henry Woolsey … at the time of the telephone conversation of December 30, 1984, which gave rise to the charges in Counts 13 and 14…." In other words, Fagan's only contention as to either count 13 or count 14 is that the evidence does not show that he induced and procured the threats made by Woolsey to Riley in the December 30, 1984, telephone conversation.[7] Fagan does not,

---

believe it clear that *McNally* does not change the result here. In *McNally* the Court rejected the theory "that the mail fraud statute proscribes schemes to defraud citizens of their intangible rights to honest and impartial government" and instead "read section 1341 as limited in scope to the protection of property rights." *McNally* also noted, with apparent approval, that in *Durland v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896), the Court had held that "any scheme or artifice to defraud," as used in the predecessor to section 1341, "is to be interpreted *broadly insofar as property rights are concerned*" (emphasis added). Moreover, in *McNally* the defect was in the charge, and the Court did not address the sufficiency of the evidence. It stated that

"the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance…. Nor was the jury charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent."

Here, as we have observed, *see* note 2, *supra,* the charge is not before us, and no complaints have been made as to it. We also note that Justice Stevens, in his dissenting opinion in *McNally*, stated (and the majority opinion did not disagree):

"Additionally, 'if an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal.' Restatement (Second) on Agency, section 408 (1958). This duty may fulfill the Court's 'money or property' requirement in most kickback schemes."

We believe that there is sufficient evidence that the scheme here was one to deprive Texoma of its property rights, *viz.:* its control over its money, as it parted with its rental payments on the basis of a false premise; the economic value of possibly being able to rent the boats from Fagan for less, had it known he was willing to accept less; its right to the kickbacks its employee Riley received from Fagan.

7. As previously observed, *see* note 2, *supra,* Fagan made no motion for judgment of acquittal. On the fifth day following the verdict he did move for an extension of time "within which to file post trial motions including but not limited to a Motion for New Trial and a Motion In Arrest of Judgment pursuant to Rule 33 and Rule 34…." The next day, March 6, 1986, the district court entered an order allowing Fagan "through March 14, 1986, within which to file a motion for new trial and/or a motion in arrest of judgment pursuant to Rules of Criminal Procedure, Rule 33 and Rule 34." On March 14, 1986, Fagan filed a document captioned "Motion For New Trial" stating that he "moves pursuant to Rule 33 … that the Court grant him a new trial." This motion does not in any way

among other things, assert that *Woolsey*, in his December 30, 1984, call to Riley, did not violate 18 U.S.C. §§ 875(b) and 1512(a).

 We reject Fagan's contention. Fagan is not guilty as an aider and abettor unless he " 'willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he wished to bring about.' " *United States v. Fischel*, 686 F.2d 1082, 1087 (5th Cir.1982) (quoting Fifth Circuit precedent). An aider and abettor is punishable for criminal acts that are the "natural or probable consequence of the crime that he advised or commanded...." *Russell v. United States*, 222 F.2d 197, 199 (5th Cir. 1955). *See also United States v. Barnett*, 667 F.2d 835, 841 (9th Cir.1982) (delay between counsel to commit crime and principal's act does not necessarily absolve aider and abettor). Measured by these principles, the evidence linking Fagan to Woolsey is such that a rational fact finder could find him guilty beyond a reasonable doubt.

According to Woolsey's testimony, in the fall of 1984 Fagan repeatedly expressed concern about what Riley might say in his testimony in Texoma's civil lawsuit against Fagan and others. In Woolsey's words, "He [Fagan] stated that he couldn't have Riley testify and that he was willing to pay $20,000 for a no show." Fagan repeated this statement on many occasions, including in December 1984. Woolsey further testified:

"Q Did he offer you or anyone else any money to pursue that opportunity?

"A It was my understanding that it was more or less an open offer.

"Q Open offer for what?

"A For Don Riley not being able to testify.

"Q Did you understand that to mean a bribe or a murder? Or any other thing?

"A I understood it to mean that it would be whatever it took for him not to testify, and that it would not necessarily rule out him being not there permanently.

"Q In other words murdered?

"A Yes, sir.

"Q Did you in November or December—about how many times did you talk with Mr. Fagan, and where did you talk to him about these conversations of no shows?

"A There were numerous conversations. Most of them by telephone. Normally I would speak to him at his home. Also at his business occasionally."

relate to the sufficiency of the evidence (or of the indictment). The same day Fagan's counsel also filed a document entitled "Motion In Arrest of Judgment" stating that he "moves that the judgment of conviction with respect to Counts 13 and 14 of the Indictment be arrested pursuant to Rule 34 of the Federal Rules of Criminal Procedure for the following, among other, reasons." The first reason given is that "Counts 13 and 14 ... are a duplication of charges" since each involves "the precise same alleged conduct," and so the verdict on both, or at least on one of the two, "should be arrested" (this complaint is not raised on appeal). The next reason (stated in paragraph 3) is:

"No evidence was introduced to show that defendant Fagan requested Thomas Henry Woolsey to make a telephonic communication with Donald Riley. No evidence was introduced to show that defendant Fagan requested Woolsey to transmit the communication in interstate commerce. No evidence was introduced to show that defendant Fagan requested Woolsey to transmit to Riley a communication containing a threat to injure."

The motion next incorporates the grounds in the Motion for New Trial, and concludes by requesting that "this Motion In Arrest of Judgment be granted." Both motions were subsequently denied without any statement of reasons.

We do not consider that the above-quoted paragraph 3 (or any other part) of the Motion In Arrest of Judgment can qualify as a post-verdict motion for judgment of acquittal under Rule 29(c). In the first place, it does not purport to be such, but rather to be under Rule 34. In the second place, it was filed more than seven days after the verdict and was hence untimely. *See United States v. Johnson*, 487 F.2d 1318, 1321 (5th Cir.), *cert. denied*, 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974). The March 6 extension order applied only to a motion for new trial under Rule 33 and a motion in arrest of judgment under Rule 34. A motion under Rule 34 does not reach the sufficiency of the evidence. Wright, *Federal Practice and Procedure: Criminal 2d* § 571 at 373.

Hence we review Fagan's claim on appeal that the evidence is insufficient to show that he induced or procured Woolsey's December 30 threats under the manifest miscarriage of justice standard. *See* note 2, *supra*.

Woolsey explained that by "an open offer" he meant that he did not understand Fagan to be asking that Woolsey personally procure Riley's absence, but that "if I could secure someone" to do so "that would be fine," and that Fagan was making "requests" to him, Woolsey, "to assist in that."

Following these conversations with Fagan, Woolsey went to Riley's home in the evening of December 26, 1984. He testified that in making this visit, and a telephone call he made from the Riley home to Riley in Breaux Bridge, Louisiana, the same evening:

"A I was trying to get a solution to the matter that would be less drastic than one that might occur if he didn't listen to me.

"Q Which would have been what?

"A I think the man would have been killed."

Riley testified that he received a call the evening of December 26 from his wife, who was crying, and that she put Woolsey on the phone. Riley further related that Woolsey then told him

"I'm here to do you a favor. And said, you better play along with us. Said *there's a contract out to kill you,* and to keep you from your deposition being used against Mr. Fagan. And *I can either get that contract to work—I can make the money by killing you,* or we can give you a certain amount of money to leave the country and never hear from you again. And said, I'll be back in touch with you." (Emphasis added).

Woolsey testified that after he called Riley on the 26th, he called Fagan from the Riley home and told Fagan:

"A That I thought we could probably get Mr. Riley to agree not to testify by the offer of money.

"Q As opposed to anything else?

"A As opposed to anything, yes.

"Q As opposed to what?

"A As opposed to more drastic means."

Riley's daughter, who was in the Riley home on the 26th, heard Woolsey speak to her mother, and then on the phone to her

father, and then on the phone to another man—whom Woolsey's testimony shows to have been Fagan. As to this latter call, Riley's daughter testified that Woolsey "asked the man on the phone if he would cancel the deal if he can make Don Riley cooperate with him." Riley's daughter feared for her father's life, as well as her mother's and her own.

Later in the evening of the 26th, after he left the Riley home, Woolsey again called Fagan on the subject of Riley's not testifying. He also called Fagan on the same subject on December 28th. On both occasions, he told Fagan he thought Riley would accept money not to testify, and he testified that Fagan "was in agreement with payment" as a means of getting Riley not to testify. After talking to Fagan on December 28, Woolsey called Riley. Woolsey testified as to this connection with Riley:

"Q Let me rephrase it. When you said, it's going to be good news, on the 28th, was that because you had talked to Mr. Fagan?

"A Yes, sir. That's correct.

"Q And did Mr. Fagan lead you to believe something?

"A Yes.

"Q And what did he lead you to believe?

"A That the payment of monies would be agreeable."

■ However, the testimony reflects that Woolsey and Riley had not, through the 28th, agreed on a sum. Riley was asking for considerably more than $20,000, and the only figure Fagan had authorized for a "no show" was $20,000. Woolsey called Riley again on December 30. The pertinent parts of that conversation are as follows:

"Woolsey: Don, the man cannot afford to have you testify....

"Riley: Well, what's he gonna offer me?

"Woolsey: Ah, there are *two options.* What do you need?

[At this point, Riley hemmed and hawed over how much money he would have to be paid to keep silent. When Riley

would not produce a firm number, Woolsey brought up the second option.]

"Woolsey: The *second alternative*, it's not hard to come up with.

"Riley: Yeah, what's that?

"Woolsey: That *you don't testify at all.*

"Riley: How come?

"Woolsey: Like I said, it's not hard to come up with.

[Riley immediately became more cooperative, and the pair began negotiating the size of the bribe. Before reaching a final number, Riley and Woolsey had the following exchange.]

"Riley: Okay. Well ... I guess whatever it takes, Tom. I sure don't want [my] family hurt and I don't want to get knocked off.

"Woolsey: Good thinking, now tell me what it takes.

[Finally Riley agreed to a bribe of $50,-000. Before closing the conversation, Woolsey resorted to further thinly-veiled threats as if to seal the deal.]

"Woolsey: ... *I didn't have to go by your home the other evening.* Okay?

"Riley: Well, you did.

"Woolsey: Yes, but *I could have left a contract* and it would have been cheaper. And as you well know, I don't have any reason to think kind of you...." (Emphasis added).[8]

The jury could reasonably determine that Fagan had made known to Woolsey his willingness to pay $20,000 to anyone who would cause Riley not to testify, whether by violence or threats of violence or bribery, that Fagan had solicited Woolsey's assistance in effectuating this "open offer," and that he was in contact with Woolsey as Woolsey began his course of threats of violence against Riley commencing on December 26 and continuing on December 28 and 30. That Fagan told Woolsey on December 30, after Woolsey reported on his conversation that date with Riley, not to further contact Riley because "he was probably wired," in no way compels a contrary conclusion. Indeed, it merely suggests a belated change of mind. The jury could properly infer that Fagan induced and procured Woolsey's December 30 threats of violence to Riley to prevent the latter from testifying.

 Accordingly, we reject Fagan's sole attack on his conviction under counts 13 and 14. We further observe that an adequate jurisdictional basis for sections 1512(a) and 875(b) is shown, inasmuch as Woolsey's threats were made in the December 30 interstate telephone call, which Woolsey placed from Texas to Riley in Louisiana, and the proceeding from which Riley was threatened to withhold his testimo-

8. The December 30 conversation focused more expressly on bribery, but also plainly threatened violence. Clearly on December 30, as also on December 26, Woolsey was telling Riley that he had one of two choices: either (1) accept $20,-000 and agree to absent himself, or (2) suffer violent consequences, possibly death. Riley testified in substance that this was how he understood the December 30, as well as the December 26, conversation. The jury could reasonably find that in the December 30 conversation Woolsey threatened Riley with violence if he did not agree not to testify. *See United States v. Capo*, 791 F.2d 1054, 1060, 1069–70 (2d Cir. 1986) (for purposes of section 1512(a), defendant's gratuitous statement to prospective witness that defendant was *not* in the "mob" and that the brother of an organized crime figure had said that all would be well if everyone stayed silent was enough evidence to support conviction).

In this connection, we recognize that witness bribery by itself does not violate section 1512(a). *See United States v. King*, 762 F.2d 232, 238 (2d Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1203, 89 L.Ed.2d 316 (1986); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir.1984); *United States v. Risken*, 788 F.2d 1361, 1368 (8th Cir.) ("§ 1512 prohibits only specific types of conduct—intimidation, physical force, threats or attempts to do so, misleading conduct, or harassment"), *cert. denied,* — U.S. ——, 107 S.Ct. 329, 93 L.Ed.2d 302 (1986); *United States v. Dawlett*, 787 F.2d 771, 775 (1st Cir.1986) ("[s]ection 1512(a) reaches only certain specifically enumerated types of witness tampering; other types of conduct, no matter how morally reprehensible, are not prohibited by the statute"); *United States v. Wesley*, 748 F.2d 962, 964 (5th Cir.1984) ("§ 1512 ... focuses solely on the protection of witnesses ... from intimidation"), *cert. denied,* 471 U.S. 1130, 105 S.Ct. 2664, 86 L.Ed.2d 281 (1985). Likewise, section 875(b) apparently would not reach simple bribery. *See United States v. Blount*, 229 F.2d 669, 671 (2d Cir.1956).

ny was a lawsuit then pending in the United States District Court.[9]

## Conclusion

Having considered and rejected all of Fagan's claims of error,[10] and discerning no possibility of manifest miscarriage of justice in his convictions, the judgment below is accordingly

AFFIRMED.

---

**9.** Woolsey's guilt as a principal (which is a necessary predicate to Fagan's guilt under 18 U.S.C. § 2) was thus established as to section 1512(a) (count 13). This is also true with respect to section 875(b) (count 14), subject only to the single possible question of whether there was sufficient evidence that Riley's freedom to testify in the civil suit was a "thing of value" to him. *See United States v. Heller,* 579 F.2d 990, 997 (6th Cir.1978) (indicating that under section 875(b) threat must be to make victim give up something of value). Here Riley was also a party to the suit, and it is not inconceivable that his testifying therein would be of value (or economic value) to him (as well as to Texoma and the public), just as his not testifying was of value to Fagan. *See United States v. Zouras,* 497 F.2d 1115, 1121 (7th Cir.1974) (in section 875(b) prosecution, testimony of victim of threat to prevent her testimony "indicates that she valued the right to testify"). *See generally United States v. Sheker,* 618 F.2d 607, 609 (9th Cir.1980) ("thing of value" under 18 U.S.C. § 912); *United States v. Jeter,* 775 F.2d 670, 680–682 (6th Cir. 1985) ("thing of value" under 18 U.S.C. § 641; "thieves' market" concept), *cert. denied,* —— U.S. ——, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986). However, we do not resolve this matter, and decline to search the record for evidence in this respect, for Fagan (who is represented by counsel) has raised on appeal no complaint whatever as to this aspect of the case (nor did he below). We do not search the record for unassigned error, and contentions not raised on appeal are deemed waived. *United States v. Johnson,* 718 F.2d 1317, 1325 n. 23 (5th Cir.1983) (en banc). *See also McGee v. Estelle,* 722 F.2d 1206, 1213 (5th Cir.1984) (en banc); *Olgin v. Darnell,* 664 F.2d 107, 108 n. 1 (5th Cir.1981). An exception will be made where necessary to prevent a manifest miscarriage of justice. None such is possible here. No fine was imposed on the section 875(b) count (count 14), and the confinement thereon was for the same two-year period, and was concurrent with that imposed on the other ten counts, including the section 1512(a) count (count 13) which involved the identical conduct. We recognize that the $50 special assessment (under 18 U.S.C. § 3013) on Count 14 prevents the sentence on that count from being concurrent for purposes of the concurrent sentence doctrine, so that we are obliged to review all assigned errors as to that count (as we have done) notwithstanding that its sentence is *otherwise* concurrent as respects other counts. *Ray v. United States,* —— U.S. ——, 107 S.Ct. 2093, 95 L.Ed.2d 693 (1987). But the bare possibility that this $50 assessment was improperly imposed does not raise the spectre of manifest miscarriage of justice so as to dispense with the rule that only assigned errors are considered on appeal. We further note in this connection that although the section 3013 assessement is *mandatory,* it was not imposed on *any* of the nine counts under section 1341. Moreover, regardless of the evidence as to "thing of value" under section 875(b), Fagan would clearly be guilty of the lesser included offense of inducing and procuring Woolsey's violation of section 875(c). *Cf. United States v. Dickinson,* 706 F.2d 88, 93 (2d Cir.1983) (discussing reduction of conviction of greater offense to lesser included offense); *United States v. Figueroa,* 666 F.2d 1375, 1380 (11th Cir.1982); *United States v. Melton,* 491 F.2d 45, 57 (D.C.Cir.1973).

**10.** Fagan also asserts in his "Summary of Argument" (but not in his "Statement of Issues" or "Argument") that "the failure of the [trial] court to grant an *in camera* hearing" on his motion for new trial and motion in arrest of judgment (*see* note 7, *supra*) "precluded an effective consultation of these motions." However, the brief contains no argument or authority in support of this contention and there is no explanation of how or why the lack of *in camera* treatment precluded effective consideration. We regard the contention as waived, and in any event are unable to discern any merit in it.