**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**RICO INDUSTRIES, INC., and Richard**
**Hughes Wilkins,**
**Defendants–Appellants.**

No. 87–6117.

United States Court of Appeals,
Fifth Circuit.

Aug. 29, 1988.

Rehearing and Rehearing En Banc
Denied Oct. 11, 1988.

Paul Kratzig, Corpus Christi, Tex., for Rico.

J.A. Canales, Nancy M. Simonson, Corpus Christi, Tex., for Wilkins.

Paula C. Offenhauser, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Howard Steward, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GARZA and POLITZ, Circuit Judges.

CLARK, Chief Judge:

Appellants, Richard Hughes Wilkins and Rico Industries, Inc. (Rico), were convicted of seven counts of mail fraud in connection with the purchase of natural gas by Wilkins' employer, Lone Star Gas Company (Lone Star). Wilkins and Rico secretly received kickbacks from a contract Wilkins negotiated on behalf of Lone Star. Wilkins and Rico challenge their convictions and the district court's order of restitution to Lone Star, which included prejudgment interest. We affirm the conviction and affirm the order that Wilkins pay restitution to Lone Star equal to the amounts taken by Wilkins and Rico. We reverse the order that Rico pay restitution and the order to pay interest as part of restitution. We also remand to the district court to permit clarification of its order that Wilkins pay restitution in light of subsequent developments.

## I.

Lone Star Gas Company is a public utility providing natural gas service to customers in Oklahoma and Texas. As a public utility, Lone Star is charged with the duty to provide reliable, quality service at the lowest possible price to its customers. Both the maximum price Lone Star can charge its customers and the maximum profit it can earn are controlled by the Texas Railroad Commission. In 1980 Lone Star found it increasingly difficult to meet the rising demand for natural gas, and began an aggressive search for natural gas.

Richard Wilkins was the district manager of Lone Star's Corpus Christi division. His duties included the negotiation and administration of natural gas purchase contracts. In August of 1980, Wilkins negotiated a gas purchase contract between Lone Star and Coronado Transmission Company (Coronado) for the purchase of 20 billion cubic feet of natural gas. The final contract was approved by Lone Star's senior executives on Wilkins' recommendation.

On its face, the terms of this contract were competitive and favorable to Lone Star, but the contract concealed a 25% kickback of its net revenues to Wilkins. Apart from the written terms of the contract disclosed to Lone Star, Wilkins and Coronado's president, Louis A. Fritz, had agreed to pay and to conceal payment to Wilkins of illegal kickbacks of the profits derived from the Lone Star/Coronado contract. The kickbacks were concealed through a system of intercorporate transfers. Rico Industries was one of the corporations utilized to hide the kickbacks. Wilkins created and maintained total control over Rico. In addition to Coronado, Fritz controlled two other companies that were utilized in the coverup, CB Gas Gathering and Gulf States Equities.

During the period when the Coronado contract was executed, Lone Star main-

tained a written conflict-of-interest policy. Under this policy employees were required to give written disclosure of any financial interest in a gas purchase contract between Lone Star and one of its suppliers. Wilkins never supplied this notice. Had he done so, the contract would not have been signed by Lone Star.

Wilkins' kickback was paid in eight installments by check made payable to Rico Industries. Wilkins and Rico were indicted on eight counts of mail fraud based on those checks. A jury found both defendants guilty of seven counts, and acquitted on one. Wilkins was sentenced to five years imprisonment and fined $1,000 on each count. The sentences were to run concurrently as to custody only, with the first six months to be served and the balance of the incarceration suspended for five years supervised probation. As a condition of probation, Wilkins was ordered to pay the $7,000 fine, to perform 384 hours of unpaid community service, and to pay restitution to Lone Star in the amount of $519,838 (Lone Star's direct loss of $368,-400 plus interest at 9% for the four years preceding judgment). Rico was ordered to pay the restitution jointly with Wilkins. Following sentencing, Lone Star and the appellants settled a parallel civil suit.

Wilkins and Rico raise four challenges to their conviction and sentence. First, they challenge the sufficiency of the evidence to support the jury's determination. Second, they claim that Lone Star suffered no economic injury. Third, they challenge the district court's order of restitution, and fourth, they claim that the issue of restitution is mooted by the settlement of their civil suit with Lone Star. We affirm the conviction of Wilkins and Rico, but reverse in part the district court's order of restitution, and remand for further determination by the district court of the effect of the settlement of the civil suit.

## II.

■ There is sufficient evidence to support the jury's finding of mail fraud. The standard of review for challenges to the sufficiency of the evidence is well settled:

"whether, after viewing the evidence presented in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Santisteban*, 833 F.2d 513, 516 (5th Cir.1987), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). All reasonable inferences must be resolved in favor of the jury's verdict. *Id.*

■ The elements of mail fraud are (1) the existence of a scheme to defraud that (2) involves the use of the mails for the purpose of executing the scheme, and (3) the specific intent to commit fraud. 18 U.S.C. § 1341; *United States v. Fagan*, 821 F.2d 1002, 1008 (5th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). In addition, the scheme to defraud must be aimed at the property rights of the victim. *McNally v. United States*, — U.S. —, —, 107 S.Ct. 2875, 2880–81, 97 L.Ed.2d 292 (1987). Wilkins and Rico challenge the sufficiency of the government's evidence to prove use of the mails, and that the use of the mails was an integral part of the scheme to defraud.

At trial, the government proved the existence of a mailing through the testimony of Loma Terry, an employee of Louis A. Fritz, the president of Coronado. Although Ms. Terry could not remember personally mailing the specific checks, she testified that the checks from Fritz to Rico were sent through the mails as a part of ordinary office procedures, whether by her personally or by another employee. This was the logical procedure, because the checks were mailed from Fritz's companies in Corpus Christi to Rico's bank in Houston 200 miles away. Based on this testimony, a rational jury could reasonably conclude that the checks were sent by mail.

The defendants also argue that the mailings occurred after the fraud was completed, and therefore, were not made in furtherance of the scheme to defraud. In the defendant's view, the scheme reached fruition when Lone Star signed the Coronado contract; therefore, the mailings did not

influence or affect Lone Star's actions in any way. This argument, however, ignores the purpose, goal, and motive of Wilkins' and Rico's scheme to defraud Lone Star—money. "The checks contained the proceeds of the fraud and thus contained the 'lifeblood of the scheme' from the defendant's viewpoint." *United States v. Diggs*, 613 F.2d 988, 999 (D.C.Cir.1979), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980) (citation omitted). Certainly from Wilkins' point of view, the scheme was not complete until he was paid.

Mailings that distribute the proceeds of the scheme to defraud among the perpetrators are "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The money Wilkins received was the fruit of his crime. To Wilkins, receipt of his money was the most important part of the fraud. Since the payments were to be made in installments, each one had to be concealed to allow the rest to flow. To hide the payments, they were made through dummy corporate transfers, and because the companies controlled by Wilkins and Fritz were 200 miles apart, Wilkins certainly should have foreseen that his share of the fraud would come through the mails.[1] "It is not necessary that the scheme contemplate the use of the mails as an essential element.... Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* 347 U.S. at 8–9, 74 S.Ct. at 362–363.

### III.

The defendants argue that the United States did not and in fact could not prove an injury to the property rights of Lone Star. The mail fraud statute protects only against schemes or artifices to defraud the property rights of citizens. *McNally*, 107 S.Ct. at 2881. In defendant's view, Lone Star did not suffer an economic loss because it received its statutory maximum profit without regard to the purchase price kickback. Any increased cost incurred because of Wilkins' 25% "commission" was passed on to consumers, plus Lone Star's maximum markup. A lower contract cost would not have given Lone Star any increase in profits. The defendants raise this regulatory defense as an absolute bar to prosecution. They rely on this court's opinion in *United States v. Ballard*, 663 F.2d 534 (5th Cir. Unit B 1981), *as modified on reh'g*, 680 F.2d 352 (5th Cir. Unit B 1982). *Ballard* involved a mail fraud conviction based on an employee's receipt of kickbacks from the buyers of oil from his employer. In that case we held that the scheme to defraud the employer was not covered by section 1341, because the employer, whose prices for oil were strictly regulated by federal law, could not have charged a higher price, even if it had known that its employees were receiving kickbacks from certain buyers.

*Ballard* is distinguishable from the instant case. *Ballard* dealt with a regulated seller. This seller sold at its highest lawful price. So, knowledge of its employee's receipt of kickbacks could not have induced a change in its policies. Lone Star is a regulated buyer and distributor. Although a lower purchase price would not directly create greater profits because its profit

---

1. The defendants raise specific challenges to two counts. The check that forms the basis of Count 6, they argue, was issued in error and was reimbursed, and therefore, was only tangentially related to the fraud. There was contrary evidence adduced at trial, however, that no reimbursement occurred, so the jury could have found this fact against the defendants. Furthermore, even if the check was sent because of a miscalculation, it was designed to distribute the proceeds of the fraud, and thus was a necessary part of the scheme, whether efficacious or not.

As to Count 7, the defendants argue that the check was issued after the defined time period in the indictment and so may not support a conviction, relying on *United States v. Cina*, 699 F.2d 853, 861 (7th Cir.), *cert. denied*, 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983). This argument ignores the fact that the indictment lists each count by check and the date of the check. Therefore, the indictment explicitly covers the period in question.

from the conduct of its business was set by law, Lone Star could have sold the gas to its customers at a lower rate and still maintained its maximum profit margin. Such a lower selling price translates directly into economic benefits to Lone Star; a lower price increases Lone Star's good will, can increase user consumption, and most importantly, confirms Lone Star's fulfillment of its duty as a public utility—to provide quality service at the lowest possible price. The fact that Wilkins' kickback was passed directly to customers does not negate the impact his fraud caused Lone Star. Direct monetary loss is not required by the mail fraud statute. *Carpenter v. United States*, — U.S. —, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987).

■ Related to this argument that Lone Star did not suffer economic detriment from the kickback scheme, the defendants argue that the district court erred in excluding some documentary evidence prepared by the defendant's expert, which purported to prove the favorable nature of the Coronado contract. However, the fact that the contract, even without the kickback, appeared favorable is irrelevant to the issue of fraud.[2] As this court has observed, "A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value." *Fagan*, 821 F.2d at 1010 (citation omitted). Coronado paid Wilkins 25% of the proceeds of its contract. If Lone Star had known of the kickback, it could have negotiated with Coronado for itself and its customers to receive the sums Wilkins was secreting for himself. While the deal struck might look fair in the abstract, the truth is that the fraud prevented an even more favorable contract. In *Fagan* we held that a scheme similar to the instant one "was one to deprive Texoma of its property rights, *viz:* its control over its money, as it parted with rental payments on the basis of a false premise; the economic value of possibly being able to rent the boats from Fagan for less, had it been known he was willing to accept less...."

2. Lone Star admitted that the Coronado contract was, in relation to similar contracts during this period, highly favorable. The defendant's

*Id.* at 1010–11 n. 6. *See also id.* at 1008–11. As we noted then, this reasoning is entirely consistent with the Supreme Court's limitations in *McNally*. *Id.* at 1010–11 n. 6; *Cf. Carpenter*, 108 S.Ct. at 321.

## IV.

The district court ordered Wilkins and Rico jointly to pay full restitution to Lone Star, including prejudgment interest for 4 years. The defendants challenge the legal basis of this order. We affirm the order to the extent that it orders Wilkins to pay restitution of Lone Star's actual damages. We reverse that part of the order requiring payment of prejudgment interest and that part of the order that Rico pay restitution. Furthermore, any sums paid by Rico must be credited to Wilkins.

■ Restitution may be made a condition of probation. 18 U.S.C. § 3651. Only Wilkins, however, was placed on probation, so the part of the order directed to Rico must be reversed.

■ The Victim and Witness Protection Act does not provide an alternative basis for the court's order because all but $287.96 of Lone Star's damages occurred prior to the effective date of that Act, January 1, 1983. 18 U.S.C. § 3579. That Act "permits a sentence requiring restitution only of losses resulting from criminal acts committed after January 1, 1983." *United States v. Corn*, 836 F.2d 889, 896 (5th Cir.1988).

■ Restitution is a criminal penalty. Criminal penalties do not bear interest. *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L.Ed. 3 (1947). Therefore, prejudgment interest may not be imposed on the amount ordered to be paid as restitution under 18 U.S.C. § 3651. *United States v. Sleight*, 808 F.2d 1012, 1020 (3rd Cir.1987). We therefore reverse the order to pay prejudgment interest as part of restitution.

evidence, therefore, could also have properly been excluded as cumulative.

## V.

Following imposition of sentence, Civil Action No. H–87–3410 was filed by Lone Star against Wilkins and Rico. That action is claimed to arise from the same acts as this criminal case. We are told that action has been settled. The defendants argue that this settlement moots all restitution issues. In the defendants' words, "Lone Star has been made 'whole.'" Whether this is true for the purposes of restitution depends upon what payment was made in the settlement, whether the claims settled involved the same acts of the defendants as those that are predicates of their criminal convictions, and whether the payment satisfies the penal purposes the district court sought to impose. If it is based on the same acts, the object of restitution—to restore the party harmed—would indicate that Wilkins be credited with the amount of the settlement. We therefore remand to the district court to permit that court to amend the order of restitution to conform with this opinion and the facts developed concerning the settlement.

## VI.

For the foregoing reasons, the decision of the district court is

AFFIRMED in Part, REVERSED in Part, and REMANDED.