UNITED STATES of America,
Plaintiff–Appellee,

v.

Newton Alfred WINN, Defendant–
Appellant.

No. 90–1110.

United States Court of Appeals,
Fifth Circuit.

Nov. 20, 1991.

Prof. Bruce Rogow, Fort Lauderdale, Fla., for defendant-appellant.

James B. Tucker, Asst. U.S. Atty., George Phillips, U.S. Atty., Jackson, Fla., for plaintiff-appellee.

Before DAVIS and BARKSDALE, Circuit Judges and SCHWARTZ,[1] District Judge.

CHARLES SCHWARTZ, Jr., District Judge:

A jury convicted Newton Alfred Winn on all counts of a three count indictment, to wit: (1) Count I charged conspiracy to kidnap and hold for ransom Mrs. Annie Laurie Hearin in violation of 18 U.S.C. § 1201(c); (2) Count II charged mailing a threatening communication in violation of 18 U.S.C. § 876; and (3) Count III charged perjury before a grand jury in violation of 18 U.S.C. § 1623. Both the acts of having the ransom note mailed (Count II) and committing perjury before the grand jury (Count III) are alleged to have occurred during the pendency of the conspiracy.

Winn raises five arguments on appeal. First, he contends that the district court erred in denying his motion for judgment of acquittal because the evidence failed to prove a conspiracy. His second contention concerns the use of summary charts of trial testimony at trial, their introduction into evidence and submission to the jury as an evidentiary exhibit allegedly in violation of Rule 1006 of the Federal Rules of Evidence, thus denying him a fair trial. The third assignment of error focuses on the district court's remark to the jury during instructions on the law that the jury should "seek the truth." Essentially, the argu-ment is that such instruction distorted the duty of the jury to find guilt beyond a reasonable doubt. Fourth, the defendant complains that the district court erred in denying his motion to sever the conspiracy and mailing charges because the joinder of the perjury charge permitted the jury to bolster and cumulate evidence. The final assignment of error is in regard to the imposition of a two-level upward adjust-ment for obstruction of justice to the sen-tence.

Finding no error, we affirm Winn's con-viction and sentence for all of the following reasons.

## I. FACTS AND PROCEDURAL HISTORY

### A. *The Kidnapping and the Ransom Note*

On July 26, 1988, 72-year old Annie Lau-rie Hearin,[2] wife of Robert M. Hearin, was kidnapped from their Jackson, Mississippi home. Mrs. Hearin had hosted a bridge club party at her home which ended around 3:00 p.m. Later that afternoon around 4:30 p.m., Mr. Hearin returned home and went upstairs to rest. About an hour later, he went back downstairs and sought to deter-mine the whereabouts of his wife. Unable to find her and thinking she must be with their daughter, he called their daughter's home. When his son-in-law answered the phone and informed him that his daughter was out of town, he asked his son-in-law to come over.

While continuing the search for Mrs. Hearin, her son-in-law discovered a ransom note on the floor of the entry hall. The ransom note directed Mr. Hearin not to contact the police and to pay money to a series of individuals otherwise unknown to him.[3] The name of the defendant, Alfred

1. Senior District Judge of the Eastern District of Louisiana, sitting by designation.

2. Mrs. Hearin has not been found. Her hus-band, Robert Hearin, died on November 28, 1990. In May 1991, she was declared dead in order to clear the way for the settlement of their estate estimated at $200,000,000.00. *Missing Woman is Ruled Dead,* Times–Picayune, August 10, 1991, at B1, B5.

3. The note stated:
 Robert Herrin [sic]
 Put these people back in the shape they was [sic] in before they got mixed up with School Pictures. Pay them whatever damages they

Newton Winn, was included on the list. The ransom note further indicated that all the named individuals on the ransom note had financial trouble with School Pictures, Inc., a business in which Robert Hearin had a substantial financial interest. (Tr. at 107–17.) Mr. Hearin and his son-in-law called the police and reported Mrs. Hearin missing and further informed the authorities that her necessary medication could not be found in the house. During their investigation, the police found and collected samples of blood from the front door of the Hearin's home. (Tr. at 176, 203–06, 209–11.) Analysis determined the blood to be Type A (Tr. at 229), the same type as Mrs. Hearin's. (Ex. G–34, No. 5.)[4] As part of the investigation as to her whereabouts, the police, and later the Federal Bureau of Investigation ("FBI"), investigated the persons listed in the ransom note.

## B. *Ward's Lie*

Defendant Newton Alfred Winn, a St. Petersburg attorney, was one of those listed on the ransom note[5] left at the Hearin home on the date of the kidnapping and was a possible suspect early on in the investigation. In his initial questioning by the authorities as to his whereabouts on the date of the kidnapping, Winn denied being in Jackson. On July 29th, after discussions with his attorney and agents of the FBI, Winn asked Don Ward, his paralegal, to corroborate his alibi that Ward personally observed him in Florida on July 26th. (Tr. at 319–20, 370–80, 429.) The alibi, as told by Ward, was that Winn had telephoned him on July 26th about 6:00 to 6:30 p.m. asking him to bring $100.00 to a St. Petersburg bar, and upon going to the bar Ward found Winn outside the bar intoxicated and with a black prostitute. (Tr. at 315, 374–76.) As instructed by Winn, Ward related this fabrication to FBI agents prior to the issuance of a subpoena for Winn to appear on August 3, 1988 for testimony before a federal grand jury in Mississippi which was investigating the kidnapping. (Tr. at 429, 972–73.) Ward also repeated this lie on August 1st in a sworn statement given to and notarized by an investigator for Winn's attorney at the time (Joe Donahey). (Tr. at 371–76.) (Exhibit D–24.)

## C. *The Grand Jury Hearings*

On August 3, 1988, seven days after Mrs. Hearin's kidnapping,[6] Winn appeared before a grand jury of the Southern District of Mississippi. Winn denied knowing anything about the kidnapping in those grand jury proceedings.[7]

On August 16th and 17th, 1988, Ward testified before the grand jury in the Middle District of Florida and denied knowing anything about the kidnapping. (Tr. at 315–16.) In the Florida grand jury proceeding, Ward, as per Winn's earlier instructions, repeated the fabricated alibi

---

want and tell them all this so they can know what you're doing but don't tell them why you are doing it. Do this before ten days pass. Don't call police.

[The names are:] Carl Sewart, Arnold Belnap, Victor Hannedol, Carl Patton, Hirmam Stutts, Hal Warner, Jim Combs, Vincent Price, N. Alferd [sic] Winn, George Meacher, Page Bruton and Jerry Maroon.

If any is dead, pay his children.
Exhibit G–2.

4. Mrs. Hearin had Type A (positive) blood. (Ex. G–34, No. 5.) Winn had Type A (negative) blood. (Tr. at 1049.) Because the sample was so small, the laboratory technicians were unable to determine whether the Type A blood sample that was tested was positive or negative. (Tr. at 232–33.) Although these facts do not prove Winn's guilt, they however are not exculpatory.

5. *See supra,* note 3.

6. At this point in time, Winn had engaged the assistance of counsel.

7. Winn's responses to questions posed before the grand jury were as follows:

Q. Did you kidnap Annie Hearin?
A. I did not.
Q. Do you have any knowledge of the disappearance of Annie Hearin?
A. Nothing other than what has been told me in very recent days.

\* \* \* \* \* \*

Q. So, other than the information you have received from the FBI, your attorney, and your staff, do you have any other information concerning the disappearance of Annie Hearin?
A. No, ma'am, I do not.
(Ex. G–7, at 11–12.)

(i.e., that he [Ward] saw Winn in St. Petersburg, Florida with a prostitute on the date of Mrs. Hearin's kidnapping).

### D. *The Second Letter and Marilyn Taylor* [8]

On August 15th, Mr. Hearin received an envelope bearing the postmark "Atlanta, Georgia, August 12th" enclosing a letter dated August 10th, both of which were in his wife's (Mrs. Hearin's) handwriting. (Tr. at 124–28.) In the letter, Mrs. Hearin essentially pleaded with her husband to cooperate with her kidnappers (i.e. "these people") or else they would seal her up in a cellar.[9]

The following day, after determining the amount of the School Pictures suits against the people named in the original ransom note, Mr. Hearin sent checks to each, including one to Winn for $145,000. Winn or his attorney returned the check ten days later. (Tr. at 128–29.)

Marilyn Taylor, a one-time girlfriend of Winn, testified [10] that on July 31, 1988, five days after Mrs. Hearin's kidnapping, Winn contacted her and told her that he might need her to do a favor for him. Soon thereafter, on August 2nd or 3rd, Winn called Marilyn and inquired as to whether she was "trustworthy." He further indicated that he would be contacting her later in the week.[11] Winn in fact called Marilyn Taylor again on August 4th. After indicating that he did not want anyone to see them together, he set up a meeting with Marilyn on Saturday, August 6th at 7:30 a.m. behind the Quality Inn in Deland, Florida.

At the August 6th meeting, Winn cautiously approached Marilyn Taylor's car. After getting in the car, Winn took a pen and paper out of his pocket and wrote, "Were you followed?" Ms. Taylor responded by shaking her head, indicating her answer, "No." Winn then wrote, "Is your car bugged?" to which Ms. Taylor once again responded negatively. Winn then crumpled up the piece of paper and placed it in his pocket.

Winn then proceeded to tell Taylor that he wanted her to mail a letter for him from a place at least one day's drive out of Florida on August 9th, 10th or 11th, preferably August 10th, but no later than the 11th. After mutually deciding that instead of driving out of the state of Florida she would fly, they further agreed that she (Taylor) would fly to Atlanta International Airport.

Marilyn further testified that Winn then instructed her: (1) to fly under an assumed name; (2) to pay cash for her tickets; (3) to buy a one-way ticket to Atlanta; and (4) thereafter, to purchase a one-way ticket to return. Winn also told her he would prefer that she fly from one Florida airport to Atlanta and return from Atlanta to a different airport in Florida from which she could then take a shuttle back to the car she had initially taken to the airport. Winn instructed her not to take her own car (a four wheel drive station wagon) to the airport for the reason that it was too noticeable and that instead she should drive someone else's car to the airport. Upon arriving in Atlanta, she was not to ask for directions or talk to anyone; was not to take a cab, but instead, was to take mass transportation to a downtown post office; was not to mail the letter in a low volume post office or at a drop box, or at the airport or near the airport. Winn's final instructions included that to avoid detection, Taylor was to change her clothes and her appearance upon arrival at the Atlanta airport.

At the conclusion of their August 6th rendezvous, Winn proceeded to put on sur-

---

8. See, letters of Marilyn Taylor to Alfred Newton Winn. (Ex. D–108, *in globo.*)

9. The letter read:

"Bob, [i]f you don't do what these people want you to do, they are going to seal me up in the cellar of this house with only a few jugs of water. Please save me, Annie Laurie" (Ex. G–3.)

10. (Tr. at 454–78.) In early 1989 agents of the FBI interviewed Marilyn Taylor and she gave them substantially the same information as set out in her trial testimony reported herein.

11. It was August 3rd that Winn appeared before the federal grand jury in Mississippi and denied knowing anything about Mrs. Hearin's kidnapping.

gical gloves and take a manila business envelope out of his coat. He informed Ms. Taylor that the actual envelope to be mailed was inside the manila envelope and wrapped in a cloth napkin. Winn gave her explicit orders that: (1) she was absolutely not to look at the face of the envelope; and (2) she was to dispose of the napkin and manila envelope, preferably at the Atlanta airport, or in a public place where it would go out in the trash undetected by anyone. He also told Taylor not to touch the envelope which was to be mailed. Winn then gave her $500.00 in cash for traveling expenses along with his final instruction which was that she was not to call his office because he would know almost immediately if she had been successful.

Ms. Taylor testified that she followed Winn's instructions with a few exceptions. She took a taxi to a nearby post office because she felt the time for her return flight would not permit her to go further. At the post office, *she looked at the face of the envelope and saw that it was a small personal type one and addressed to Jackson, Mississippi.* She also testified that because of a sign near the mailbox, she knew that it was too late in the day to be postmarked August 11th and would instead be postmarked August 12th. She also failed to dispose of the manila envelope and cloth napkin as Winn had directed. (Tr. at 494.) The FBI, on February 11, 1989, the day after interviewing Ms. Taylor, found the cloth napkin in an area in Deland, Florida where she stated she had thrown it away. (Tr. at 495, 1138–40.)

Ms. Taylor specifically identified the envelope (Exhibit G–3) which contained the ransom letter in Mrs. Hearin's handwriting received by Mr. Hearin on August 15th as the one Winn had given her to mail. She also identified the cloth napkin (Ex. G–14) in which the ransom letter in Mrs. Hearin's handwriting was wrapped. (Tr. at 495.)

### E. Ward Finally Cooperates and Tells the Truth

Only when confronted with the information given by Ms. Taylor to the FBI did Ward reveal the details of the conspiracy which began long before the date of the kidnapping and events subsequent thereto, including Winn's instructions that Ward lie to investigators and the Florida grand jury. In particular, on March 21, 1989, just prior to Winn's indictment and after being promised non-prosecution for his truthful cooperation, Ward appeared before the grand jury for the Southern District of Mississippi and recanted his prior testimony given before the Florida grand jury. (Tr. at 392–98.)

Ward then testified at trial that: (1) Winn did *not* work in his St. Petersburg law office between July 22 and July 29, 1988, thus recanting his previous corroboration of Winn's alibi for July 26th (Tr. at 312–13, 341–42); (2) Winn called him on July 28th and later, on July 29th, asked him to lie to the investigators and the Florida grand jury to corroborate his (Winn's) alibi about being with the black prostitute on the evening of the kidnapping (Tr. at 370–80); (3) During these conversations, he knew of Mrs. Hearin's kidnapping (Tr. at 319–20, 370–71, 433); (4) On August 4th, the day after Winn testified before the grand jury in Mississippi, Winn initiated a conversation in which he (Winn) asked how long it would take for the Hearin's attorneys to return the property, including deeds and jewelry, to each name on the ransom note (Tr. at 337–38);[12] (5) Winn, after receiving Hearin's check for $145,000, had showed it to him (Ward), and remarked, "That's not what I wanted," (Tr. at 338–40); (6) Winn directed him (Ward), prior to the kidnapping, to travel to Mississippi to do extensive investigation regarding School Pictures, Inc. and Hearin, which included photographing ingress/egress to Hearin's place of business and residence in Jackson (Tr. at 324–36);[13] and (7) Con-

---

12. They agreed that given Mr. Hearin's staff of attorneys and paralegals it would probably take about twenty-four hours.

13. Ward made at least three trips to Mississippi between October 1986 and February 1988 while conducting his investigation. He gave Winn the photographs he had taken of the Hearin's home

firmed his (Ward's) involvement in the conspiracy, which included but was not limited to his role of corroborating Winn's alibi as heretofore set out, and to conduct the pre-kidnapping investigations of the Hearins in Jackson which was of some assistance in carrying out the actual kidnapping scheme. (Tr. at 311–35, 367, 427–37.)

### F. *The Vans*

One of the Hearin's neighbor's, Mrs. Gale White, positively identified the defendant Winn as the person sitting in a white van down the street from the Hearin's home on April 7th or 8th, 1988. (Tr. at 806–07.) Mrs. White reported the van's Tennessee license plate number 2B2A52 [14] to the Jackson police. Said license plate had been stolen from a station wagon parked in long-term parking at the New Orleans Airport between March 26 and April 3, 1988. (Tr. at 847–54.) During that time period, i.e., March 26 and April 3, 1988, Winn had rented a white van. Records from Magruder Car and Truck Leasing, a New Orleans leasing company, indicated Winn rented from it: (1) a white van on April 1, 1988 for one day which was driven 452 miles (Ex. G–21); (2) a white van on April 7, 1988 for two days which was driven 536 miles (Ex. G–22); and (3) a yellow van for one day on April 22, 1988 which was driven 500 miles (Ex. G–23). [15] In connection with each of these rentals, Winn gave as a deposit a credit card which was not in his name; however, he paid for the rentals in cash or by money order. (Tr. 768–779.)

and business in Jackson. (Tr. at 335–36, 408–10).

14. Mrs. White had contemporaneously recorded the license plate number because she considered the vehicle suspicious. (Tr. at 804–06). The license plate number was traced by the police to a 1979 Oldsmobile station wagon registered in Tennessee. (Tr. at 830–34.) (Ex. G–18.)

15. The round trip distance between the rental agency and the Hearin home was 384 miles. (Tr. at 984.)

16. Additionally, another trial witness, Patricia Morat, testified that on June 2, 1988 she sold

Dr. E. Leonard Posey, Jr., another of Hearin's neighbor's, testified he saw Winn sitting in a white van across the street from Hearin's home on July 15, 1988. At trial, Dr. Posey made a positive identification of the defendant Winn. (Tr. at 867–71.) Ward's testimony also confirmed the fact that Winn was not working in his Florida office on July 15th. (Tr. at 336–343.)

George Hawkins, a construction worker repairing the foundation of a church around the corner from the Hearins' home, testified that he spoke to Winn at the church on July 25, 1988, only 26 hours before Mrs. Hearin was kidnapped and that Winn was driving a white van. He also made a positive identification of the defendant. [16] (Tr. at 938–47.)

### G. *The Summary Witness and Charts*

The government's final witness, FBI agent Patrick McGlennon, testified both as a fact and summary witness, using chronological charts tracking the various events by dates. The Court had reviewed the charts prior to trial and determined they were necessary to aid the jury in understanding the government's case, because of the numerous facts and circumstances, their interrelationship and the multifarious sources of said facts and circumstances. (Tr. at 964.) [17]

The Court instructed the jury, both just prior to actual use of the charts and in his final instructions, that agent McGlennon's summary testimony and charts would be admitted solely to explain the facts dis-

Winn a 1979 white Dodge van for $1,800.00. Winn requested the title transfer not list the vendee's name, and he did not want a copy of a bill of sale Ms. Morat had prepared. Despite Winn's objection, but in accordance with Florida law, Ms. Morat removed the Florida license plate from the van. (Tr. at 259–79.) It was ultimately titled to Don Ward. (Tr. at 322.)

17. It is indeed questionable whether even an above average panel of jurors, without some framework in the form of a chart or otherwise, could organize the veritable cache of circumstantial evidence linking the players in the alleged conspiracy in order to glean the significance from the multifarious facts associated with the kidnapping of Mrs. Hearin.

closed by evidence in the case; the charts were not evidence; and if the charts did not correctly reflect the evidence, then the jury should disregard them. (Tr. at 964, 990–1000, 1159–60.)

## H. The Defense

The defense called three witnesses: (1) Dr. Joseph Burton, a forensic pathologist who expressed the opinion that the napkin referred to by Ms. Taylor in which the ransom note was wrapped prior to mailing did not look like it had been exposed to the weather for 5 months and that it did not appear that the blood spots found at the Hearin's front door splattered (Tr. at 1061–85); (2) Granville Ratcliff, a Tennessee deputy who knew Ms. Taylor testified that he spoke to her in the spring of 1988 regarding the possibility of obtaining stolen tags from a vehicle(s) in a junkyard (Tr. at 1095–1100); and (3) Don Ward was recalled as a defense witness; however, his four lines of testimony are hardly worth mentioning. (Tr. at 1107.)

## I. Severance of Perjury Count Denied

Winn's pre-trial motion to sever the perjury count (Count III) was renewed at trial and denied because the facts as to each were interwoven; e.g., Winn's appearance and recitations before the grand jury were part and parcel of Count I, the conspiracy charge, and would be introduced as evidence in furtherance of the conspiracy, and the perjury charge was similarly related. (Tr. at 5–7.)

## J. The Verdict, Sentence and Winn's Appeals

On February 7, 1990 the jury found Winn guilty on all counts. Immediately after the jury returned its verdict, the district judge orally adjudged the defendant guilty and advised him and his counsel that "you have a right to appeal your case to the" Fifth Circuit and then set the sentencing for April 3, 1990. (Tr. at 1228–29.) On February 14, 1990, Winn filed three motions: (1) a motion in arrest of judgment; (2) a motion for judgment of acquittal, or in the alternative for a new trial (both of which were denied the following day); and (3) a notice of appeal from the jury verdict. The notice of appeal stated in pertinent part that Winn appealed "from the jury verdict rendered in this matter on the 7th day of February, 1990." It did not mention the pending sentence.[18]

At the sentencing hearing on April 20, 1990,[19] the trial court held that a two level increase for obstruction of justice was appropriate under the circumstances.[20] Pursuant to the Sentencing Reform Act of 1984, Winn was sentenced to imprisonment for a term of two-hundred thirty-five months on each count (Counts 1, 2 and 3), with the sentences to run concurrently, which is to be followed upon release from confinement by five years of supervised release. A judgment of conviction which included the sentence was entered the same day. Following sentencing, the district judge did not re-advise Winn of his right to appeal.[21] A form judgment, entitled "Judgment Including Sentencing Un-

---

**18.** Sentencing, as in this case, is generally later, following preparation of the pre-sentence investigation report and a sentencing hearing. Fed. R.Crim.P. 32(a).

**19.** The original date for sentencing was continued to this date.

**20.** The Court stated:
I have reviewed Application Note 4 on Section 3C1.1 which provides, and I quote, where the defendant is convicted both of the obstruction offense and the underlying offense, which is the case here, the count for the obstruction offense will be grouped with the count for the underlying offense under Subsection C of Section 3D1.2 .... The offense level for that

group of closely related counts will be the offense level for the underlying offense increased by the two level adjustment specified by this section or the offense level for the obstructions offense, whichever is greater. So it appears to the court that the two level enhancement is in order based on the perjury situation.
(Sentencing, at 36.)

**21.** Following the pronouncement of the sentence the district court, pursuant to Federal Rule of Criminal Procedure 32(a)(2), should have advised Winn of his "right to appeal, including any right to appeal the sentence...."

der the Sentencing Reform Act" was used and entered in the record.

On May 8, 1990, eighteen days after being sentenced, Winn filed a re-notice of appeal from the jury verdict.[22] The re-notice of appeal is basically identical to the February 14 notice of appeal and it also refers only to the jury verdict and does not mention the sentence.[23]

## II. DISCUSSION

### A. *Were Winn's Appeal(s) Effective*

The timing and form of Winn's post-verdict filings prompt questions concerning our jurisdiction. The parties did not raise this issue on appeal; but, when necessary, as here, we must examine the basis of our own jurisdiction *sua sponte. E.g. United States v. Cronan*, 937 F.2d 163, 164 (5th Cir.1991).

■ A timely notice of appeal is not jurisdictional; however, in this circuit it is a prerequisite to our exercise of jurisdiction. *United States v. Ugalde*, 861 F.2d 802, 805 (5th Cir.1988); *United States v. Burns*, 668 F.2d 855, 859 (5th Cir.1982). Rule 4(b) of the Federal Rules of Appellate Procedure provides in part:

> In a criminal case the notice of appeal by a defendant shall be filed in the district court within 10 days after the entry of ... the judgment or order appealed from.... A notice of appeal filed after the announcement of a decision, sentence or order but before entry of the judg-

ment or order shall be treated as filed after such entry and on the day thereof. If a timely motion in arrest of judgment or for a new trial on any ground other than newly discovered evidence has been made, an appeal from a judgment of conviction may be taken within 10 days after the entry of an order denying the motion.

Therefore, the re-notice of appeal in this case which was not "filed in the district court within 10 days after the entry" of the judgment on April 20, was not timely and this Court may not exercise its jurisdiction based upon it.[24]

■ To determine whether the February 14 pre-judgment notice perfected the appeal we must consider: (1) whether a new notice was required after the post-verdict motions; and (2) whether an appeal of the sentence is precluded because the notice (a) mentions only the verdict and does not refer to the sentence or the judgment incorporating it, (b) was filed before the sentence, or (c) resulted in prejudice to the government.

Winn's post-verdict motions were denied after the filing of the February 14 notice of appeal, but before the April 20 entry of the judgment. In *Cronan*, 937 F.2d at 164, this court held that "a premature notice of appeal following a criminal jury verdict but prior to sentencing and entry of the judgment of conviction is effective to perfect an appeal as of the date the sentence is entered as a judgment." (Citations from oth-

---

**22.** The re-notice of appeal was served on the government on May 1, 1990.

**23.** "Re-notice is hereby given that ... [Winn] hereby appeals to the United States Court of Appeals for the Fifth Circuit from the jury verdict rendered in this matter on the 7th day of February, 1990."

**24.** Federal Rule of Appellate Procedure 4(b) also provides:
> Upon a showing of excusable neglect the district court may, before or after the time has expired, with or without motion and notice, extend the time for filing a notice of appeal for a period not to exceed 30 days from the expiration of the time otherwise prescribed by this subdivision.

Although the re-notice was not filed within the required ten days, it was filed within 40 days from the judgment. "In criminal cases, this

court has customarily treated a late notice filed after the ten-day period and before the lapse of forty days (ten plus thirty), as a motion for determination as to whether excusable neglect entitles a defendant to an extension of time to appeal." *United States v. Awalt*, 728 F.2d 704, 705 (5th Cir.1984). Under similar circumstances, this court has remanded such cases to the district court for a determination of whether excusable neglect entitles a defendant to an extension of time to appeal. *See, e.g., United States v. Shillingford*, 568 F.2d 1106, 1107 (5th Cir.1978). However, because we hold, *infra*, that the appeal as to both the conviction and sentence was perfected by the February 14 notice of appeal, it is not necessary to remand for the district court to determine whether excusable neglect exists.

er circuits omitted.) In reaching its decision, the *Cronan* court found "[e]specially persuasive ... the fact that Rule 4(b) does not contain the language in Fed.R.App.P. 4(a)(4) [for appeals in civil cases] providing that, under certain circumstances [if filed prior to the disposition of certain post-trial motions], a premature notice of appeal 'shall have no effect.'" *Id.* (footnote omitted). *See also Burns*, 668 F.2d at 858 (second notice of appeal unnecessary to assert error in the denial of a motion for a new trial); *Ugalde*, 861 F.2d at 805 (following *Burns*). Further, Rule 4(b) provides that the February 14 notice of appeal is "treated as filed after entry of such judgment and on the day thereof." Thus, pursuant to said case law and Rule 4(b), Winn's premature notice of appeal is treated as filed on the day of the entry of the judgment, April 20, and effectively perfected his appeal as to the issues related to the jury verdict.

The defendant in *Cronan* did not appeal his sentence; therefore, that court did not decide "the question of whether a defendant may appeal his sentence *where his notice of appeal is filed after a verdict but before sentencing.*" *Cronan*, 937 F.2d at 165 n. 5 (emphasis added). Therefore, we must next determine whether the February 14 notice of appeal, which does not mention the sentence, perfected Winn's appeal of his sentence which was imposed on April 20, 1990.

■ Federal Rule of Appellate Procedure 3(c) states in pertinent part that "[t]he notice of appeal shall specify the party or parties taking the appeal; [and] shall designate the judgment, order or part thereof appealed from ..." *United States v. Ramirez*, 932 F.2d 374, 375 (5th Cir.1991), provides:

> The first clause of FRAP 3(c), stipulating that the notice of appeal must specify the parties taking the appeal, is jurisdictional.... On the other hand, we broadly construe the second clause of FRAP 3(c), which requires that the notice of appeal designate the judgment or order from which the appeal is taken.

... Several of our cases have dealt with notices of appeal on which the appellant failed to designate or "misdesignated" the ruling being appealed. Our most recent decision on such failures or errors notes that we liberally construe the order designation portion of Rule 3(c) and, *when the intent to appeal an unnamed or mislabeled ruling is apparent (from the briefs or otherwise) and no prejudice results to the adverse party,* the appeal is not jurisdictionally defective. *Turnbull v. United States*, 929 F.2d 173 (5th Cir.1991) (citations omitted).

(Emphasis added.) Thus, we hold that the failure of the February 14 notice of appeal to refer to the judgment or sentence to be imposed on a later date does not *per se* preclude appealing the sentence.

■ Before determining whether prejudice to the government exists we must first examine whether Winn, by filing the notice of appeal on February 14, after announcement of his conviction but *before* announcement of his sentence, also precluded an appeal of the sentence *per se*. Under Rule 4(b), a premature notice of appeal is treated as timely only when "filed after the *announcement* of a decision, *sentence* or order but before entry of the judgment or order." (Emphasis added.) The February 7 announcement of guilty by the district court was a Rule 4(b) "announcement of decision."

As noted in *Cronan*, 937 F.2d at 164 n. 1, the sentence is the judgment in a criminal case. Additionally, as in *Ramirez*, 932 F.2d at 376, the printed judgment form herein is entitled "Judgment Including Sentence Under the Sentencing Reform Act." The form provides the bases on which he was adjudged guilty and details his sentence. In *Ramirez*, a defendant, Sanchez, had drawn a line through the portion of his notice of appeal which stated that he was appealing his *sentence*, but left intact the portion that stated that he was appealing the *judgment*. *Id.* at 375. In finding that it could also exercise jurisdiction over issues related to sentencing, this court stated:

[T]he cancellation of the sentence portion of the notice of appeal does not appear to have prejudiced the government, which did not oppose Sanchez's motion to amend his notice of appeal [to include his sentence]. The government is aware that Sanchez is appealing his sentence because he addressed that matter in his brief on the merits, which is in the possession of the government. Furthermore, the record reflects that trial counsel sought a full transcript of all proceedings, including the sentencing proceeding.

932 F.2d at 376. The court further noted:

Sanchez has properly and timely appealed the *judgment,* and it is entitled "Judgment Including Sentence Under the Sentencing Reform Act." His trial attorney might well have considered the stricken language on the notice of appeal to be redundant or surplusage. In fact, had Sanchez filed a notice of appeal which merely stated that he was appealing the judgment, his notice may well have been sufficient because the title of the judgment appealed from expressly reflects that his sentence under the Sentencing Reform Act is included.

*Id.* Although the facts of *Ramirez* are distinguishable from the instant situation (i.e., a premature notice of appeal was not involved in *Ramirez,* as Winn appealed from the "jury verdict" and not the "judgment"), this reasoning is most persuasive. Therefore, the February 14 notice of appeal permits an appeal from the sentence as well as the conviction if the government has not been prejudiced.

The question of whether prejudice exists generally focuses on whether the government has been misled by an arguably defective notice of appeal. For example, in *Turnbull,* it was noted that "[r]epeatedly this court has adhered to its previous [pre-*Torres* ] rule that a mistake in designating a judgment appealed from should not bar an appeal as long as the intent to appeal a specific judgment can be fairly inferred and the appellee is not prejudiced or misled by the mistake." 929 F.2d at 177. In discussing whether prejudice had been

shown in the facts before it, the court noted:

In this case, the United States, as the appellee, did not initially object to Foster's appeal on jurisdictional grounds. Indeed, the United States concedes in its supplemental brief that it was not prejudiced or misled by Foster's technically imperfect notice of appeal. Furthermore, both parties briefed issues encompassing the underlying judgment and not just the district court's denial of Foster's motion for a new trial.

*Id.* at 178. *See also Ramirez,* 932 F.2d at 376 (discussed above); *Ugalde,* 861 F.2d at 805 (government not prejudiced where it had fully briefed issues in question); *Burns,* 668 F.2d at 858 ("[T]he second notice of appeal [after post-verdict motions] is literally a 'notice' requirement. Without a showing of prejudice against the government, it would be unreasonable and unfair to refuse to consider an issue which was thoroughly briefed and clearly recognized as an issue by both parties growing out of the criminal trial and its aftermath.").

In the instant case, the government did not contest jurisdiction as to any aspect of the appeal. To the contrary, it stated in its briefs that the "[n]otice of appeal had been previously filed on February 14, 1990, presumably permissible as provided in Rule 4(b), Fed.R.App.P." It also noted, but did not contest, the May 8 re-notice of appeal. The parties, in response to a pre-oral argument jurisdiction inquiry by this Court, filed letter briefs on this issue the day before oral argument. The government's brief identified no prejudice resulting from this court's consideration of Winn's challenge to the sentence. To the contrary, it represented at oral argument that it had not suffered any prejudice as a result of the premature notice of appeal. It particularly noted the possible confusion caused when, as set out heretofore, on February 7 the district court immediately after the verdict issued its instruction regarding the right to appeal. Furthermore, the issues relating to sentencing were fully briefed by both parties. Accordingly, no prejudice having been asserted, much less shown,

Winn may appeal both his conviction and sentence.

## B. *The Evidence of Conspiracy to Detain Mrs. Hearin*

This Circuit in *United States v. Moree,* 897 F.2d 1329, 1332 (5th Cir.1990) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), reiterated the standard of review applicable to gauging the sufficiency of evidence:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have reasonably found the essential elements of the crime beyond a reasonable doubt. (emphasis in original).[25]

In evaluating the sufficiency of the evidence, we must also draw all reasonable inferences and make all credibility choices which support the jury's verdict. *United States v. Bordelon,* 871 F.2d 491, 493 (5th Cir.), *cert. denied,* 493 U.S. 838, 110 S.Ct. 121, 107 L.Ed.2d 82 (1989).

■ The essence of the crime of conspiracy is joinder. *Bordelon,* 871 F.2d at 493. The government does not have to prove joinder by direct evidence; rather, it can be inferred, by both the jury and the reviewing court, from the facts and circumstances of the case. *United States v. Bankston,* 603 F.2d 528, 531 (5th Cir.1979).

Here, Winn argues the complete failure of the government's evidence in regard to joinder warranted his acquittal on the conspiracy count. The record, however, belies defendant's contention.

■ Part of the offense in a kidnapping case is the holding of the victim for ransom. 18 U.S.C. § 1201(a). The letter sent by Winn through Ms. Taylor on August 11, 1988 was an effort to collect the ransom. The evidence as to Ward's complicity in this aspect of the conspiracy was more than

sufficient for a jury to conclude he was part of the conspiracy; in fact it was overwhelming. On July 29, 1988, the evidence reflects that Ward knew Mrs. Hearin had been kidnapped and was being held for ransom. Then prior to: (a) payment of the ransom, (b) Winn's subpoenaed appearance before the grand jury on August 3rd, and (c) the expiration of the ten days to comply with the ransom demand,[26] he became an active participant in the conspiracy to assist Winn in covering up his part in the kidnapping and the payment of the ransom as set out hereinabove. In particular, he lied to corroborate Winn's alibi about being with a black prostitute on the evening of Mrs. Hearin's kidnapping, and he lied in his sworn statement dated August 1, 1988 wherein he reiterated this story. (Ex. D–24.) By this time, any reasonable person would relate his (Ward's) past activities (at Winn's request) of investigating School Pictures, Inc. and photographing ingress and egress of Hearin's home and place of business to the kidnapping on July 26th and the events thereafter.[27] Moreover, whether Mrs. Hearin was alive at the time Ward became a knowing member of the conspiracy is irrelevant because of the attempt through the use of the letter dated August 10th and postmarked August 12th to collect the ransom. A co-conspirator needs only to be a part of one part of the conspiracy to be a member of the whole conspiracy. Therefore, Ward's activities were sufficient to enable the jury to conclude that there was a conspiracy and he was a co-conspirator. In summary, and as Judge Lee's conspiracy charge to the jury properly reflects, a conspiracy may be inferred from the conduct of the parties involved. Thus, the evidence aforesaid pertaining to Ward's lying as instructed by Winn at a time he knew of Mrs. Hearin's kidnapping and ransom demand, along with his other activities

---

**25.** In *Moree,* we were confronted with the identical issue, that is whether the evidence was sufficient to support a conspiracy conviction.

**26.** Since the ransom note allowed Mr. Hearin ten days to comply with its demands a reasonable jury could infer that Mrs. Hearin was alive, at the minimum, until August 5, 1988.

**27.** The government does not have to conclusively prove Ward's state of mind; "[i]t suffices to show facts and circumstances from which the jury reasonably could infer that [he] knew [his] conduct was unauthorized and illegal." *Bordelon,* 871 F.2d at 494.

as directed by Winn, is sufficient conduct from which to infer Ward's agreement to become a party to the conspiracy.

Winn argues on appeal that Ward's exculpatory disclaimer that he (Ward) never conspired to kidnap Mrs. Hearin somehow cancels out any consideration of inculpatory overt acts of Ward in furtherance of the conspiracy to detain and hold Mrs. Hearin for ransom. In *United States v. Freeman,* 660 F.2d 1030, 1035 (5th Cir. Unit B 1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982), DeWeese, captain of the vessel "Cowboy," testified in the drug-smuggling conspiracy case against certain members of his crew under a court order and a grant of use immunity. This court held that the jury was entitled to consider DeWeese's inculpatory statements regarding the crew even though they rejected other exculpatory statements by him on their behalf.

■ The victim's letter in her own handwriting requesting payment of the ransom (Ex. G–3) also corroborates that more than one person was involved in her abduction. Mrs. Hearin specifically states "these people" will seal her up in a cellar with only a few jugs of water if her husband does not cooperate. In his reply brief, Winn for the first time argues that the letter is hearsay.[28] In the absence of manifest injustice, we do not consider arguments raised for the first time in the appellant's reply brief. *Baris v. Sulpicio Lines, Inc.,* 932 F.2d 1540, 1546 n. 9 (5th Cir.1991); *United States v. Clinical Leasing Serv., Inc.,* 930 F.2d 394, 395 n. 1 (5th Cir.1991) (on petition for rehearing); *Najarro v. First Fed. Sav. and Loan Ass'n,* 918 F.2d 513, 516 (5th Cir.1990). Rejection of this argument at this time does not involve manifest injustice. Moreover, this letter could have been properly admitted into evidence at trial, notwithstanding any contemporaneous objection thereto, pursuant to the catch-all exceptions to the hearsay rules, Fed. R.Evid. 803(24) and 804(b)(5).

■ Moreover, a conspiracy conviction does not depend for its validity on the identification of co-conspirators. Rather, it is sufficient that the evidence "supports 'the proposition that such a co-conspirator did exist and that the defendant did conspire with him.'" *U.S. v. Moree,* 897 F.2d at 1332 (citing *United States v. Pruett,* 551 F.2d 1365, 1369 (5th Cir.1977); *See also Rogers v. United States,* 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951)). The letter supports such a proposition.[29]

Accordingly, and in summary with respect to the conspiracy charge, we conclude: (1) there was sufficient evidence for the jury to conclude that more than one person was involved in Mrs. Hearin's kidnapping; (2) viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the elements of crime of conspiracy and in particular the element of joinder; and (3) the existence of conspiracy is *not* "pure supposition," and there is no evidentiary void as suggested by Winn. Thus, the Court affirms the district court's denial of defendant's motion for acquittal on the conspiracy count.

## C. *Use of Summary Testimony and Charts*

■ The charts and summary testimony were used by the prosecutor as merely an aid to put the myriad of complex and intricate pieces of testimonial and documentary evidence comprising the puzzle together in a chronological fashion. Unless the trial court committed abuse of discretion, the trial court's ruling should be affirmed. *United States v. Duncan,* 919 F.2d 981, 988 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2036, 114 L.Ed.2d 121 (1951).

As heretofore mentioned, the court adequately instructed the jury as to the limited purpose of summary testimony/charts both prior to its use and again in its final instructions.[30] These instructions, when

---

**28.** No objection to the letter as hearsay was made at trial.

**29.** Additionally, it is implausible that one person could handle this entire scheme.

**30.** At the time the summary evidence was intro-

compared with the instruction approved by this Court in *Duncan*, 919 F.2d at 988, appear almost identical. In *Duncan*, we concluded that "[e]ven if the admission of summary evidence might have had some potential for prejudice, we consider any possible harmful effect neutralized by" this instruction. *Id.* Given the overwhelming evidence of Winn's participation in a conspiracy to kidnap Mrs. Winn, any error the district court committed by sending the charts to the jury was plainly harmless.

In *United States v. Stephens*, 779 F.2d 232, 238 (5th Cir.1985), this Court rejected defendant's argument herein, that Federal Rule of Evidence 1006,[31] which allows for summary evidence, should be interpreted literally and restrictively as to the "voluminous document" requirement.

■ Cases such as *Duncan* and *Stephens* stand for the proposition that Rule 1006 should not be restrictively read. We have held, considering that the average jury cannot be rationally expected to compile on its own such charts and summaries which would piece together evidence previously admitted and revealing a pattern suggestive of criminal conduct, summary/testimony[32] charts may be admitted.

Although the *Duncan* court admits there exists a potential for prejudice in summaries, it held that effect neutralized by appropriate instructions such as those given on two occasions by the district judge on two separate occasions during the trial below.[33] It is irrelevant that the evidence was already before the jury without the use of summary testimony/charts; the issue is whether it can be conveniently examined. *Duncan*, 919 F.2d at 988.

Winn's reliance on *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985), is misplaced. As this Court previously stated in *United States v. Stephens*, 779 F.2d at 239:

*Pierce* did not hold that charts based upon documents already admitted in evidence are always pedagogical charts and ineligible under Rule 1006. The party in *Pierce* seeking to admit the charts into evidence did not offer the charts pursuant to Rule 1006, so Rule 1006 was not even an issue in the case.

This Circuit's decisions which deal with Rule 1006 charts run counter to defendant's argument. In fact, summaries admitted pursuant to Rule 1006 *are evidence*. *Id.* at 238; *See also United States v. Means*, 695 F.2d 811 (5th Cir.1983) (chart based on documents in evidence was prop-

---

duced Judge Lee gave the following instruction:

Summary testimony by a witness and the charts or summaries prepared by him and admitted into evidence are received for the purpose of *explaining facts disclosed by testimony or exhibits which are in evidence in the case.* Such charts or summaries are not evidence in the case. They are not in and of themselves evidence or proof of any facts.

If such charts or summaries do not correctly reflect facts or figures shown by the evidence in the case, you should disregard them. In other words, such charts or summaries are used only as a matter of convenience so if and to the extent that they are not in truth summaries of facts or figures shown by evidence on the case, you're to disregard it entirely. (Tr. at 990–91.)

In the court's final jury instructions Judge Lee once again instructed the jury:

Summary testimony by a witness and the charts or summaries prepared by him and admitted into evidence are received for the purpose of explaining facts disclosed by testimony in exhibits which are in evidence in this case. Such charts or summaries are not in and of themselves evidence or proof of any

facts. If such charts or summaries do not correctly reflect facts or figures shown by the evidence in the case, you should disregard them. In other words, such charts or summaries are *used only as a matter of convenience.* So if and to the extent that you find they are not in truth summaries of facts or figures shown by evidence in the case, you are to disregard them entirely.

(Tr. at 1159–60.)

31. "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation." Fed.R.Evid. 1006.

32. Summary of purely testimonial evidence is strictly speaking not within the purview of Rule 1006; the purpose of such summary "is simply *to aid the jury in its examination of evidence* already admitted." *United States v. Scales*, 594 F.2d 558, 563 (6th Cir.), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979).

33. *See supra*, footnote 30.

erly admitted). Here it is appropriate to distinguish between charts and summaries presented pursuant to Rule 1006 which is the instant case,[34] and mere pedagogical charts, which was the situation in *Pierce, supra.* Although the court stated in *Pierce,* absent consent of the parties, mere pedagogical charts should not be sent to the jury room with other exhibits, the case more properly stands for the proposition that a court does not err in refusing to send them to the jury room. Moreover, *Pierce* does not stand for the proposition that sending such charts to the jury room constitutes reversible error as defendant appears to suggest.[35]

■ Furthermore, even if the charts are not proper under Rule 1006, summary charts are, in the trial court's discretion, ordinarily admissible when: (1) the charts are based on competent evidence before the jury; (2) the primary evidence used to construct the charts is available to the other side for comparison in order that the correctness of the summary may be tested; (3) the person who prepared the charts is available for cross-examination; and (4) the jury is properly instructed concerning their consideration of the charts. *United States v. Goodwin,* 470 F.2d 893, 899 (5th Cir. 1972), *cert. denied,* 411 U.S. 969, 93 S.Ct. 2160, 36 L.Ed.2d 691 (1973); *McDaniel v. United States,* 343 F.2d 785 (5th Cir.), *cert. denied,* 382 U.S. 826, 86 S.Ct. 59, 15 L.Ed.2d 71 (1965). Each of these requirements were satisfied at this trial. Accord-

ingly, the admission of the charts did not amount to an abuse of discretion.[36]

There is no question but that the charts could have been used as an aid in the government's closing argument. Therefore, and particularly in view of the overwhelming evidence of a conspiracy to kidnap Mrs. Hearin, we view the summary evidence as merely cumulative and, even *if* it could be said that such use was error, it most assuredly was within the class of "harmless error."

### D. *Jury Instruction—"Seek the Truth"*

■ Winn's sole assignment of error as to the trial court's instructions to the jury focus on the final substantive instruction which was:

Remember at all times you're not arbitors [sic], you're judges, judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

■ Counsel for defendant did not object to this jury instruction as required prior to the time of jury deliberation.[37] Well-established law of this Circuit confines review of an allegedly defective instruction to which no objection was made to that of "plain error". *United States v. Gammage,* 790 F.2d 431, 434 (5th Cir.1986). The "plain error" exception shall not be invoked unless when we consider the charge as a whole, we conclude that it is so clearly erroneous that the result would be

**34.** Although Judge Lee admitted the summary testimony/charts into evidence, he continually instructed the jury that the charts and summaries were not evidence in the case. *See supra,* footnote 30. Therefore, because the district court did not consider the charts evidence we shall not consider their admissibility.

**35.** *See also United States v. Diez,* 515 F.2d 892, 905 n. 21 (5th Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976), wherein it states:

Contrary to defendants' assertion, relying on *Steele v. United States,* 222 F.2d 628 (5th Cir. 1955), this Court has never held that the jury cannot take illustrative charts with them to the jury room. In that case, we held only that the charts in question, because of their composition and layout, could not have properly have been submitted to the jury, and that it

was doubly prejudicial to accede to the jury's request for the charts *after the deliberations began.* (emphasis added).

In *Diez,* the Fifth Circuit concluded that the trial court's limiting instructions both when the government's summary witness testified and again at the close of the case eliminated any possibility of the charts confusing the jury. *Id.* at 906.

**36.** Even if the Court were to conclude that the trial judge erred by allowing the use of these exhibits, no reversible evidence would be extant, for the reason that the full cross-examination and the trial court's admonitions to the jury served to minimize the risk of prejudice. *United States v. Jennings,* 724 F.2d 436, 442 (5th Cir.), *cert. denied,* 467 U.S. 1227, 104 S.Ct. 2682, 81 L.Ed.2d 877 (1984).

**37.** Fed.R.Crim.P. 30.

a grave miscarriage of justice or seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Thevis*, 665 F.2d 616, 645 (5th Cir. Unit B), *cert. denied, Evans v. United States*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 *and Hood v. United States*, 458 U.S. 1109, 102 S.Ct. 3489, 73 L.Ed.2d 1370 *and* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

There is no such egregious error here as the trial court properly instructed the jury as to the burden of proof, that is beyond a reasonable doubt as to each and every element of the crimes charged. At the outset of the case, the trial court instructed the jury as to the "beyond a reasonable doubt" standard and further repeated the charge throughout the final instructions. In fact, in the face of reiteration of the burden of proof (i.e. beyond a reasonable doubt) no less than twenty-one times, one instruction "to seek the truth from the evidence" in no way rises to the level of a miscarriage of justice.

Winn's argument is simply that because the court's instruction to "seek the truth" was the court's final substantive remark, it confused the jury as to the burden of proof. Taking the charge as a whole, which in all other respects is correct and adequate, there is little, if any, likelihood such parting words resulted in a "grave miscarriage of justice" or affected the fairness of the proceedings. *United States v. Kimmel*, 777 F.2d 290, 294 (5th Cir.1985), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986).[38] In *Kimmel*, 777 F.2d at 294 n. 3, the instructions of the trial court included the very language at issue in this case. The *Kimmel* court likewise concluded that the trial court's instructions taken as a whole did not place undue pressure on the jury and held Kimmel's right to

an impartial and conscientious jury deliberation was preserved.

Cases cited by the defendant for the proposition that the charge was unconstitutional are inapposite. *United States v. Stanfield*, 521 F.2d 1122 (9th Cir.1975), did not involve the constitutionality of a "seek the truth" instruction; rather, it centered around a narrative at the beginning of trial which occurred in lieu of opening statements. *United States v. Calabrese*, 645 F.2d 1379 (10th Cir.1981), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1982) *and* 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981), which distinguishing *Stanfield*, pointed out that the instruction was simply an explanation that the jury's duties included the resolution of credibility issues, and did not create the impression that the jury's duty was to adopt one of two versions of the facts. In *United States v. Alston*, 551 F.2d 315 (D.C.Cir. 1976), which was not decided on constitutional grounds, the trial judge omitted a critical passage which would have clarified that the burden of persuasion had not shifted.

Accordingly, we affirm as to the Court's comment "seek the truth," which in the context herein relates to issues of credibility, and considering the jury instructions as a whole does not begin to rise to the level of "plain error."

### E. *Joinder of the Perjury Count*

Winn contends that the facts underlying the perjury charge were unrelated to the conspiracy and that he suffered unfair prejudice when the court declined to sever these charges.

In our review, the initial inquiry is whether, as a matter of law, the initial joinder of the counts was proper under Fed.R.Crim.P. 8.[39] *United States v. Fa-*

---

**38.** Moreover, the judge's "seek the truth" statement *was not the final word the jury heard. Following the judge's instructions as to the law* the parties were then allowed to argue their cases to the jury. The government and the defendant in their closing arguments, each referred to "the beyond a reasonable doubt standard" four times. Furthermore, *taken in its proper context, the judge was merely telling the*

jury to seek the "truth" in accordance with his instructions.

**39.** Fed.R.Crim.P. 8(a) allows joinder of offenses against a single defendant "if the offenses ... [1] are of the same or similar character or [2] are based on the same act or transaction or [3] on two or more acts or transactions connected together or constituting parts of a common plan or scheme."

*gan,* 821 F.2d 1002, 1007 (5th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988); *United States v. Davis,* 752 F.2d 963, 971–72 (5th Cir.1985); *United States v. Chagra,* 754 F.2d 1186, 1188 (5th Cir.), *cert. denied,* 474 U.S. 922, 106 S.Ct. 255, 88 L.Ed.2d 262 (1985) *and* 484 U.S. 832, 108 S.Ct. 106, 98 L.Ed.2d 66 (1987); *United States v. Harrelson,* 754 F.2d 1153, 1176–77 (5th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 *and* 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985); *United States v. Forrest,* 623 F.2d 1107, 1114–15 (5th Cir.), *cert. denied,* 449 U.S. 924, 101 S.Ct. 327, 66 L.Ed.2d 153 (1980).

 This Circuit's view is that "Rule 8 is to be broadly construed in favor of initial joinder." *Davis,* 752 F.2d at 971 ((citing *Forrest,* 623 F.2d at 1114) (quoting *United States v. Park,* 531 F.2d 754, 761 (5th Cir. 1976))). Joinder was clearly appropriate under the third clause of the Rule regarding a common scheme or plan.[40] The perjury occurred temporally within the pendency of the conspiracy and, further, it was in fact part of the conspiracy so that Mrs. Hearin could be unlawfully detained and the ransom collected. Unquestionably, the perjury charge grew out of Winn's attempt to avoid implication in and the detection of the conspiracy.[41] Where a substantive count such as perjury is within the scope of the conspiracy charged, as here, then joinder is proper.[42] Thus, the district court did not violate Rule 8(a) in rejecting Winn's motion to sever.

 We must next determine whether the trial judge's denial of the motion to sever under Fed.R.Crim.P. 14[43] was an abuse of discretion. *Fagan,* 821 F.2d at 1007; *Davis,* 752 F.2d at 972–74; *Chagra,* 754 F.2d at 1188; *Harrelson,* 754 F.2d at 1177; *Forrest,* 623 F.2d at 1115. To demonstrate abuse of discretion, " 'the defen-

dant bears the heavy burden of showing "specific and compelling" prejudice resulting in an "unfair trial." ' " *Chagra,* 754 F.2d at 1186.

As to defendant's argument regarding the possibility of cumulation of evidence and resulting prejudice, this was recognized in *Forrest,* at 1115, but was found to be an insufficient reason to order a new trial. *Id.* In *United States v. Williamson,* 482 F.2d 508, 511 (5th Cir.1973), we rejected this same argument, concluding in that case that segregation of the evidence as to each offense would not have resulted from severance of the offenses. Therefore, because the evidence of conspiracy to kidnap would be admissible during the trial on the perjury charge, no prejudice inures to the defendant and severance of the counts is not required.

Additionally, the jury was adequately instructed that each count stated a separate crime and was to be considered separately in determining the guilt of the accused. (Tr. at 1172.) In fact, in *Williamson,* 482 F.2d at 511–12, the trial court gave a similar instruction.

The perjury count was part of the conspiracy count, occurring during the pendency of, and in furtherance thereof. It, therefore, constituted "parts of a common scheme or plan." The evidence that Winn committed the acts charged in the conspiracy count were clearly probative of his intent to commit perjury. Accordingly, we find no merit in Winn's contention that the trial judge committed reversible error when he failed to sever the perjury count.

### F. Two–Level Increase for Obstruction of Justice

 The standard of review with respect to increases pursuant to obstruction of justice is "clearly erroneous." *United States v. Paden,* 908 F.2d 1229 (5th Cir.

---

**40.** Count I of the indictment clearly alleges as part of the conspiracy that part of defendant's role therein was that it would be covered up.

**41.** *Cf. Fagan,* 821 F.2d at 1007.

**42.** *United States v. Gentile,* 495 F.2d 626, 632 (5th Cir.1974).

**43.** Fed.R.Crim.P. 14 states that "[i]f it appears that a defendant ... is prejudiced by a joinder of offenses ... in an indictment ... or by such joinder for trial together, the court may order ... separate trials of counts."

1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 710, 112 L.Ed.2d 699 (1991).

The trial court calculated defendant's total offense level of 36 as follows:

(1) 24 base level offense—kidnapping/unlawful restraint; [44]

(2) 6 level increase—ransom demand; [45]

(3) 2 level increase—non-release of victim; [46]

(4) 2 level increase—vulnerable victim; [47] and

(5) 2 level increase—obstruction of justice [48].

Winn argues that his grouped base level of 30 already included his perjury offense, and the two-level increase for obstruction was improper and the resulting base level should have been 34 as opposed to 36.

In deciding on the final 2 level increase for obstruction of justice, the trial court looked to § 3C1.1 note 4 of the U.S.S.G.:

Where the defendant is convicted on both the obstruction offense [Count III perjury] and the underlying offense [Count I kidnapping/unlawful restraint conspiracy], the count for the obstruction of justice offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 (Groups of Closely–Related Counts). The offense level for that Group of Closely–Related Counts will be the offense level for the underlying offense *increased by the 2–level adjustment specified by this section,* or the offense level of the obstruction offense, which ever is greater. (emphasis added).

This being a multiple count situation, § 3D1.2 requires grouping and § 3D1.3 mandates the offense with the highest level control further application.[49] This nullifies defendant's argument that application of the Obstruction Adjustment is precluded by Note 2 to § 2J1.3 (perjury), which by its terms is limited only to offenses covered by that section. In the instant case, conspir-

acy kidnapping offense controls as § 3D1.2 mandates grouping and § 3D1.3 mandates the offense with the highest level control. The offense level on the conspiracy count (24) is greater than the offense level on the perjury count (12). Therefore, to the 24 the court properly added the 2-level obstruction of justice adjustment.

In support of the enhancement, there was not only evidence that Winn himself committed perjury, but there was also Ward's testimony to the effect that Winn instructed him to commit perjury to FBI investigators and the Florida grand jury, all of which impeded the investigation of the kidnapping.

Accordingly, the trial court appropriately calculated the total offense level as 36 which included the 2-level enhancement for the obstruction of justice.

### III. CONCLUSION

For the foregoing reasons, the conviction and sentence are AFFIRMED.

---

**44.** U.S.S.G. § 2A4.1(a).

**45.** U.S.S.G. § 2A4.1(b)(1).

**46.** U.S.S.G. § 2A4.1(b)(4)(A).

**47.** U.S.S.G. § 3A1.1.

**48.** U.S.S.G. § 3C1.1.

**49.** *See* United States Sentencing Commission, *Questions Most Frequently Asked About the Sentencing Guidelines* Q. 48 (Vol. IV, 1990).